30 C.C.P.A.(Patents)

**PRATT & LAMBERT, Inc., v. CHAPMAN & RODGERS, Inc.**

Patent Appeal No. 4755.

Court of Customs and Patent Appeals.

June 10, 1943.

Hervey, Barber & McKee, of New York City (Morrison T. Hankins, of New York City, of counsel), for appellant.

Beekman Aitken, of New York City, for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in a trade-mark opposition proceeding from the decision of the Commissioner of Patents reversing the decision of the Examiner of Interferences sustaining appellant's notice of opposition to the registration of appellee's trade-mark, the dominant feature of which is the numeral "61," for use on insecticides.

In its application for registration under the Trade-Mark Act of February 20, 1905, appellee stated that it had used its trade-mark on its goods since 1915.

It appears from the record that appellant is the owner of trade-mark registration No. 79,520, issued September 13, 1910, on an application filed May 18, 1910, for a mark consisting of the numeral "61" for use on varnish. It is stated in that application that appellant had used its mark on varnish since January 1, 1894. Appellant is also the owner of trade-mark registration No. 358,177, issued June 28, 1938, on an application filed February 23, 1938, for the trade-mark " '61' " for use on "Varnishes, Paint Enamels, Dry, Ready-Mixed and Paste Paints, Lacquers, Stains, Fillers, Primers, Surfacers, Putties, Under-coatings, Dryers, Thinners, and Removers." It is stated in that application that appellant had used its mark on its goods since January 1, 1894.

Appellant being the prior user of the trade-mark "61" and the marks of the parties being substantially the same, the sole issue in the case is whether the goods of the respective parties possess the same descriptive properties. If they do, the decision of the Commissioner should be reversed. If they do not, the decision of the Commissioner should be affirmed.

It appears from the record that appellant is engaged in the manufacture and sale of paints, varnishes, and similar products; that it has factories in Long Island City and Buffalo, New York, Chicago, Illinois, and Fort Erie, Canada, its principal office being in Buffalo; that appellant has extensively advertised its products and its

trade-mark "61" throughout the United States and in foreign countries; that it has sold its goods under its trade-mark throughout the United States and in foreign countries; that from 1929 to 1939 its sales amounted to more than $9,000,000 in the United States and nearly $1,000,000 in Canada; that appellant has expended large sums of money, more than $735,000 from 1929 to 1939, in advertising its goods and its trade-mark in magazines, newspapers, over the radio, and by the distribution of other printed matter; that appellant's goods are sold under its trade-mark "61" in hardware stores, paint and varnish stores, and so-called "country stores" where a variety of articles are sold, such as hardware, paints and varnishes, and many other articles; that appellant's products, sold under its trade-mark "61," are used, as stated by the witness W. P. Werheim, who has been connected with the appellant company since July 1907, as advertising manager, treasurer, secretary, and vice president, and who, at the time of the taking of the testimony in the case, was vice president and secretary of the company, "primarily for household and what we term architectural or construction purposes. They are seldom used in factories or on manufactured products." The witness further stated that, although his company did not make or sell insecticides, it would be within the natural extension of its business to do so; that some of the largest manufacturers of paint and varnish in the United States, such as the Sherwin-Williams Company, Acme White Lead and Color Works, the Glidden Company, and De Voe & Reynolds, manufacture and sell insecticides; that other paint and varnish companies have been known to make insecticides; and that all classes of people purchase paints and varnishes and insecticides. When asked whether the appellant company had "any facilities, equipment, machines, or other manufacturing processes for the making of insecticides," the witness said: "While we have some facilities and equipment that could be used for this purpose, *we have no specialized machinery as far as my knowledge goes.*" (Italics not quoted.)

The witness further testified as follows: "XQ4. Has the company ever contemplated the sale of insecticides? A. That is difficult to answer. We have never seriously discussed the making of insecticides to date.

"XQ5. Have any inquiries ever been received by the company asking to purchase insecticides? A. Not to my knowledge.

Just what facilities and equipment the appellant company had for making insecticides, the witness did not state. Furthermore, his statement that his company had no specialized machinery, so far as he knew, for making insecticides, would indicate that the witness, who, as hereinbefore noted, had been with the company since 1907 in the capacity of advertising manager, treasurer, secretary, and vice president, either had no knowledge of the machinery possessed by his company or the type of machinery necessary for the making of insecticides. In any event, it is clear from the testimony of the witness that the appellant company had no thought, at the time of the taking of the testimony in this case, of manufacturing and selling insecticides.

The witness Cornelius Brown, resident manager of the eastern division of the appellant company, who had been with the company for 19 years and whose office was located in Long Island City, New York, testified, among other things, that in his long experience with the company and in his visits to department and other stores handling appellant's paints, varnishes, etc., he had never been asked whether his company manufactured or sold insecticides; that he had never been shown in any of such stores the insecticide product of appellee sold under the trade-mark "61"; that he had never heard of any confusion in the trade resulting from the fact that his company's products and appellee's insecticides were sold under the trade-mark "61."

Appellant's witness M. F. McDonnell, who was salesman for the appellant company and who had been with that company for 18 years, stated that he was in charge of sales for the company in the Philadelphia territory; that he was familiar with the Frankford Grocery Company, located at Philadelphia, Pennsylvania; that the Frankford Grocery Company is a wholesale grocery concern which handles a number of items other than groceries; that that company is the owner of approximately 1,000 stores located in the city of Philadelphia and in the outlying districts within a radius of from 40 to 50 miles; that the appellant company sells its quick drying floor varnish and its enamel undercoating to the Frankford Grocery Company under

its trade-mark "61," and its enamel under the trade-mark "Vitralite"; that its sales are made directly to the Frankford Grocery Company, which, in turn, sells to its retail or "member" stores; that he had visited some of those "member" or retail stores at various times and had last visited them in July, 1940 (his testimony was taken in September, 1940); and that his attention had been called to appellee's insecticides, sold under the trade-mark "61," in the retail store of L. K. Lennon, Churchville, Pennsylvania, one of the Frankford Grocery Company "member" stores.

It appears from the testimony of appellee's witness Russell Sage Kelly of Philadelphia, Pennsylvania, manager of the appellee company, that he had been associated with that company and its predecessor, the 61 Chemical Company, since 1922; that the 61 Chemical Company, which was owned by his father, had sold insecticides under the trade-mark "61" since 1912; that in 1930 his father purchased the business, including the name, of Chapman Rodgers, Inc., "perfumers" in Philadelphia, changed the name of the 61 Chemical Company to Chapman & Rodgers, Inc., and continued to sell insecticides under the trade-mark "61"; that appellee's insecticides are sold to "Grocery jobbers," who, in turn, sell them to grocery stores; that appellee also sells its insecticides under its trade-mark to the Frankford Grocery Company of Philadelphia, hereinbefore referred to, and to the Richmond Grocery Company; that the grocery jobbers to whom appellee sells are located in Philadelphia; that some of appellee's goods are sold at retail in small towns, such as Woodstown, New Jersey; and that, although appellee advertised its products in the local papers until about 1930, since that time it has relied upon the personal solicitations of its salesmen for the sale of its goods. The witness further stated that the trade-mark "61" was adopted by appellee's predecessor, the 61 Chemical Company, at the suggestion of a Civil War veteran by the name of Sam Selzer, who lived at the home of the father of the witness and who was known as "Uncle Sam." In this connection, the witness said: "The Civil War period was outstanding to both my brothers [Raymond and Harry] and while thinking of a number, Uncle Sam suggested '61' and my brother [presumably Harry] followed by stating that they

should have a cannon made with our insecticide being squirted out killing bugs. This suggestion was dropped and the label, which is 'Applicant's Exhibit 1a' was the one which was adopted."

Appellee's Exhibit 1a consists of labels on which appears the name "61 Chemical Company" of Philadelphia, Pennsylvania, and the trade-mark "61" for "Disinfectant and Exterminator of Insects." The labels also contain the statement that appellee's product "Kills Mosquitoes, Bed Bugs, Roaches, Ants, Fleas, Flys."

The witness Kelly further stated that the reason his company applied for the registration of its trade-mark "61" was because it was getting out a new product, a "window cleaner," which it manufactured and sold under the trade-mark "Cryst-o-Kleer," which mark it decided to have registered, and that it then decided to register its mark "61" for use on insecticides. He further stated that his company also manufactured and sold other products, such as "Long Server Cough Syrup" and "Eureka Bug Killer."

It was the view of the Examiner of Interferences that as insecticides, of the kind manufactured and sold by appellee, and appellant's paints, varnishes, etc., were sold in the same stores and displayed in so-called "general stores" in "the same shelving sections," and as the goods of the parties were in the low price range, appellant's paints, varnishes, etc., and appellee's insecticides possessed the same descriptive properties, although, he said, they "are non-competitive and differ widely in composition and uses." The examiner further stated that he believed that "many purchasers would have knowledge that both types of products are sometimes produced by a single manufacturer," and, accordingly, sustained the notice of opposition.

In reversing the decision of the Examiner of Interferences, the Commissioner of Patents stated, among other things, that it was a matter of "common knowledge that numerous items of different descriptive properties frequently emanate from a common source"; that matches and waxed paper are manufactured by the same manufacturer in "at least one well-advertised instance"; and that, although the goods of the respective parties are sold in the same stores, that fact was only a circumstance to be considered and was not controlling of the issues in the instant case. In support of the latter statement, the

Commissioner cited the decision of this court in the case of Kraft-Phenix Cheese Corp. v. Consolidated Beverages, Ltd., 107 F.2d 1004, 1006, 27 C.C.P.A., Patents, 803, wherein it was stated, among other things, that "with respect to the drug and chain stores where the goods of both parties appear to be sold, it is a matter of common knowledge that such institutions sell an almost unlimited variety of articles in distinct and substantially unrelated lines of trade." In that case we held that cheese-coated popcorn, on the one hand, and soft drinks, on the other, did not possess the same descriptive properties.

The Commissioner also stated that the goods of the respective parties were not only noncompetitive and differed widely in composition and use, but that there was no evidence that there had ever been any confusion in trade, and that although lack of such evidence was not conclusive, it was, nevertheless, persuasive that there was no likelihood of confusion in the future, in view of the fact that appellee's goods had been sold under the trade-mark "61" for a period of 30 years. In this connection, the Commissioner cited the case of E-Z Mills, Inc., v. Martin Bros. Co., 95 F.2d 269, 272, 25 C.C.P.A., Patents, 992, 995, wherein we stated: "It is true that evidence of lack of confusion in the use of different marks may be *persuasive* that there is not likelihood of confusion, but such evidence cannot be controlling, and we are inclined, in the case before us, to give very little weight to the fact that no actual confusion has been shown." (Italics not quoted.)

■ Likelihood of confusion is usually determined by consideration of the goods to which the marks are applied and a comparison of the marks involved.

It is contended here by counsel for appellant that the goods of the parties are household articles and as such are capable of a general definition, that is, as household articles, and that, therefore, the goods of the parties possess the same descriptive properties.

■ It appears from the record that some of appellant's goods, as hereinbefore noted, are used primarily for household, architectural, and construction purposes. They obviously are not exclusively or primarily household articles. But, even if the goods of the parties are household articles, it does not follow that they possess

the same descriptive properties. There are various household articles, some of which differ widely in character, composition, and use, for example, furniture and kitchen utensils.

In the case of Williams Oil-O-Matic Heating Corp. v. Westinghouse Electric & Mfg. Co., 62 F.2d 378, 20 C.C.P.A., Patents, 775, this court held that thermostatically controlled fuel burning devices and electric refrigerating units, on the one hand, and thermostatically controlled electric sadirons or flatirons, on the other, although electrically operated, did not possess the same descriptive properties.

It is obvious from the record in the instant case that the goods of appellant (paints, varnishes, etc.) and those of appellee (insecticides) are not only noncompetitive, but differ widely in composition and use.

■ It is true that the goods of the parties may be and frequently are sold at retail in the same stores and sometimes in the same room of such stores to the same class of purchasers, and that those facts, although not conclusive, should be considered in a determination of an issue such as that here involved. However, we are of opinion that the goods of the parties differ so widely in composition and use that the concurrent use of the trade-mark "61" thereon would not be likely to cause confusion or mistake in the mind of the public or to deceive purchasers, and that, therefore, the goods of the parties do not possess the same descriptive properties.

Counsel for appellant contends that as this court held in the case of Vick Chemical Co., v. Central City Chemical Co., 75 F.2d 517, 22 C.C.P.A., Patents, 996, that certain medicinal preparations and insecticides possessed the same descriptive properties, we should now hold that appellee's insecticides and appellant's paints, varnishes, etc., also possess the same descriptive properties. Should we so hold, it would logically follow, of course, that paints, varnishes, etc., are goods of the same descriptive properties as medicinal preparations.

■ Although it has always been the policy of this court to give the language "merchandise of the same descriptive properties," contained in section 5 of the Trade-Mark Act of February 20, 1905, 15 U.S.C.A. § 85, a "liberal interpretation in order to effectuate the purpose of the act,"

914

we are not prepared to hold that paints, varnishes, etc., possess the same descriptive properties as insecticides and medicinal preparations. See General Shoe Corporation v. Forstner Chain Corporation, 113 F.2d 127, 27 C.C.P.A., Patents, 1398.

It may be, as argued by counsel for appellant, that certain paint and varnish manufacturers produce insecticides. However, we are unable to agree that the production and sale of such insecticides is within the natural or legitimate extension of the business of those manufacturers, within the purview of the Trade-Mark Act of February 20, 1905, 15 U.S.C.A. § 81 et seq.

In the case of E-Z Waist Co. v. Reliance Mfg. Co., 52 App.D.C. 291, 286 F. 461, 463, it was held that work shirts and children's knitted waists, union suits, and sleeping garments were goods possessing the same descriptive properties. In the course of its decision, the court there stated that the manufacture of "work shirts would come within the natural development of" the business of the opposer in that case who was manufacturing "children's waists, union suits, sleeping garments, etc." The court further stated: "We have said that the owner of a trade-mark will not be hampered or embarrassed in the legitimate extension of his business by the registration of the mark to another."

In the case of Simplex Electric Heating Co. v. Gold Car Heating & Lighting Co., 43 App.D.C. 28, it was held that a thermostatic steam trap, used in connection with a steam car heating apparatus, and a thermostatically operated relief value, for use on an electrically heated hot water boiler, possessed the same descriptive properties, and that, although the appellant in that case had never manufactured steam car heating systems on which thermostatic steam traps were used, the thermostatic steam traps there involved were a part of appellant's electrical and steam apparatus; that it would be within the natural extension of appellant's business to extend the use of its mark to thermostatic steam traps; and that the appellee in that case should not be permitted to "invade the present field of appellant, or the domain to which it may legitimately extend the use of its mark." In so holding, the court cited the case of Florence Mfg. Co. v. Dowd, 2 Cir., 178 F. 73, wherein it was held that the manufacturer of high-grade toilet brushes had a right, in the natural

extension of its business, to use its mark on tooth brushes. To the same effect are the decisions in the cases of Fishbeck Soap Co. v. Kleeno Mfg. Co., 44 App.D.C. 6, and Canton Culvert & Silo Co. v. Consolidated Car-Heating Co., 44 App.D.C. 491. In each of the latter two cases, and in others which it is unnecessary to cite here, the court, in stating that the owner of a trade-mark should not be hampered or embarrassed in the natural or legitimate extension of its business by the registration of a similar mark to another, held that the goods of the parties there involved possessed the same descriptive properties within the purview of the Trade-Mark Act of February 20, 1905.

However, the doctrine applied in those cases, that is, that the owner of a trade-mark should not be hampered or embarrassed in the natural or legitimate extension of its business by the registration of a similar mark to another, has no application where, as in the instant case, the goods of the parties do not possess the same descriptive properties within the purview of the Trade-Mark Act of February 20, 1905.

For the reasons stated, the decision of the Commissioner of Patents is affirmed.

Affirmed.