**S. C. JOHNSON & SON, INC., Appellant,**

v.

**Phil J. JOHNSON and Hugh H. Johnson, d. b. a. Johnson Products Co., Appellees.**

**No. 13314.**

United States Court of Appeals
Sixth Circuit.

March 30, 1959.

Walter P. Armstrong, Jr., Memphis, Tenn., and Francis C. Browne, Washington, D. C. (William E. Schuyler, Jr., of Mead, Browne, Schuyler & Beveridge, Washington, D. C., Harold F. Greiveldinger, Racine, Wisc., Walter P. Armstrong, Jr., of Armstrong, McCadden, Allen, Braden & Goodman, Memphis, Tenn., on the brief), for appellant.

John S. Porter, Memphis, Tenn. (Tom Mitchell, Jr., of Burch, Porter & Johnson, Memphis, Tenn., on the brief), for appellees.

Before McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellant, S. C. Johnson & Son, Inc., filed its complaint, claiming that appellees, Phil J. Johnson and Hugh H. Johnson, doing business as Johnson Products Co., had infringed its common law trademarks, "Johnson's" and "Johnson," as well as its registered trademarks of the same names, under federal law. The district court entered a judgment denying injunctive relief, and dismissing the complaint, from which appeal was taken.

The predecessor company of appellant, S. C. Johnson & Son, Inc., began using the trademarks, "Johnson's" and "Johnson," as early as 1888 for waxes, floor cleaners, varnish removers, wood dyes, and wood fillers, and extended the use of the trademark to floor waxing appliers—or heavily weighted floor waxing brushes—shortly before 1900. In addition to the above mentioned products, appellant company, during its existence, has continuously increased the number and name of the commodities manufactured and sold by it, as well as the products purchased from others and sold and distributed by appellant under its label of "Johnson's" or "Johnson," to include such items as insecticides for garden use, a roach and ant killer, a moth-proofing compound, additional types of wax appliers, automobile wax, insect repellents, industrial coolants and lubricants, cleansing products, furniture polishes, waxes for citrus fruits and vegetables, a substance used in repairing porcelain, and a cleaning material used in laundering.

The background of appellees' company and the beginning of its use of the family name of Johnson is pertinent.

Appellees, Phil J. Johnson and Hugh H. Johnson, brothers, of Memphis, Tennessee, in 1944, decided to buy an old factory in Selmer, Tennessee, which had been closed for some time. This factory had been engaged in the manufacture of corn brooms and mops, and was equipped with machinery to make brooms and mops. With the exception of a piece or two of additional equipment, the same machinery can make both brooms and mops, the principal equipment being the winding machines. Phil Johnson had some previous experience in the mop business—cutting mops. His father had also sold roofing mops, a type of mop later manufactured by appellees. Phil J. Johnson testified that he preferred going into business for himself instead of working for others, and that the broom and mop business was "one of the businesses a person can go into with limited capital. And another reason was, in 1944, any kind of new operation was difficult to enter, due to the fact that the war was on still, and you could not buy machinery." The two Johnson brothers thereupon formed a partnership under the name of Johnson Products Company, of Memphis, Tennessee, purchased the closed factory, and commenced the manufacture of brooms and mops.

Appellees manufacture and sell corn brooms and common cotton wet mops and wet mopheads; and they advertise, describe, and label the wet mop sold by them as a "Johnson Mop." On each of the wet mops manufactured and sold by appellees, a label is placed around the

mophead, which contains the following language:

"Mfgd. By
JOHNSON PRODUCTS COMPANY
'Finest Wet Mops and Wet Mop-
heads'
MEMPHIS, TENN.
FROM THE LAND OF COTTON
Always Ask For A
JOHNSON WET MOP
The Best Available for Washing
Your Floors
Nationally known JOHNSON MOPS are often priced as low or lower than many mops of inferior quality.
YOU BE THE JUDGE
The strong durable yarns used in JOHNSON PRODUCTS COMPANY Mops make them long lasting, and save you money. Examine and compare this mop. You will immediately SEE and FEEL the DIFFERENCE.
A trial will convince you. Your satisfaction fully guaranteed.
JOHNSON PRODUCTS COMPANY
Made only in Memphis, Tenn.
'Famous for Quality' "

Each mop handle carries a label which contains (with the exception of the particular brand name) the following language:

"Ask for a Nationally Known
JOHNSON MOP
FLOOR MASTER
Brand
It pays to Buy a Johnson Mop
Famous for Quality
10 OUNCE                NO. 18
Manufactured by
JOHNSON PRODUCTS COMPANY
801 Poplar Ave., Memphis, Tenn."

Each broom manufactured and sold by appellees carries a label on its handle, of which the following is typical:

"Ask for a Thrifty
ECONO-MIZER
BROOM
JOHNSON PRODUCTS CO.
Quality Brooms and Mops
MEMPHIS, TENNESSEE"

In its complaint, appellant company, in addition to claiming that appellees infringe appellant's common law and statutory trademark, set forth that appellees' appliances, "sold under the trademark 'JOHNSON' for cleaning floors and other surfaces, being in the nature of long-handled brooms and mops for use in wet or dry form on floors and other surfaces in homes and industrial establishments, are goods of the same general character and are used for the same general purposes as [appellant's] cleaning appliances such as its mops, brushes, brooms, dusters and cleaning and polishing cloths sold under the trademarks 'JOHNSON' and/or 'JOHNSON'S' and are competing goods"; that both appellant's and appellees' "cleaning appliances" of the nature herein described, both bearing the trademarks above mentioned, are sold in coincident geographical areas, in the same retail trade channels, and from the same store displays within such retail trade channels, thus enhancing the likelihood of confusion, mistake, or deception of purchasers as to the source of origin of appellees' goods, to appellant's irreparable damage; that appellees published misleading statements inducing purchasers to believe that appellees' goods are "nationally known," and that they "emanate from or are in some way connected with" appellant Johnson, to the damage of appellant; that appellees' acts have directly or indirectly resulted in the palming off of appellees' goods as the goods of appellant, thereby competing unfairly with appellant and causing deception, mistake, or confusion of purchasers as to the source of origin of appellees' goods to appellant's irreparable damage, through loss or dilution of appellant's good will in the trademarks, "Johnson" and "Johnson's."

Appellant does not manufacture or sell common wet mops, wet mopheads, or corn brooms—or, for that matter, mops or brooms of any kind.

Appellant sells and recommends for use in applying cleaning and waxing substances to floors, only three implements: (1) a "Glo-Coater Wax Applier," which

it first sold during the year ending June 30, 1949; (2) the "Beautiflor Wax Applier," first sold during the year ending June 30, 1954; and (3) the "Heavy Duty Wax Applier," which had been sold for six or seven years prior to the judgment of the district court in this case, entered on April 30, 1957. All of the above described implements were first sold by appellant to the public, subsequent to the sale by appellees of their mops and brooms, which commenced in 1944.

The "Glo-Coater Wax Applier" is a small household applier, consisting of a hard red plastic head, the underside of which has a chenille covering—with a long handle on the top side—designed for spreading waxes on floor surfaces. The "Beautiflor Wax Applier" is similar to the "Glo-Coater Wax Applier" and is designed to apply wax to floors. The "Heavy Duty Wax Applier" is similar to the two preceding implements, but is larger and heavier, and is also intended for the application of wax to floors. The sale, by appellant, of all other implements used as wax appliers or implements that could be considered as resembling appellees' products, even in the slightest respect—such as dust mops—had been discontinued for many years before the appellant's action in the instant case had been commenced.

None of appellant's implements for applying wax remotely resembles the common wet mops or corn brooms manufactured and sold by appellees, which give rise to the charge of infringement of trademarks in this case.

Appellant's wax appliers are not adapted for use as common wet mops or brooms; and appellees' wet mops are not adapted for use in applying wax to floors. Appellant does not recommend, or suggest, the use of its wax appliers as wet mops or brooms; and appellees do not recommend, or suggest, the use of their mops or brooms for use in applying wax to floors.

Appellant contends that, by infringement of its registered and common law trademark, appellees are guilty of unfair competition; that the use of the name, "Johnson," by appellees confuses, misleads, and deceives the public as to the origin of the goods they sell, and where there is no actual confusion, mistake, or deception, the use of the name by appellees is likely so to confuse, mislead, and deceive the public; that, in using the name, "Johnson," to appellant's damage, appellees are guilty of fraudulent intent, actual or constructive, and should be enjoined; and that the court's finding that the public was not confused, deceived, or misled was contrary to the undisputed testimony and not sustained by the evidence.

Appellees reply that they have not infringed appellant's trademark, either registered or at common law, and that they are not guilty of any unfair competition; that the evidence as to confusion and mistake is slight, and presented a conflict in the evidence, which the trial court, as the finder of facts, resolved against appellant; that the use of the name by appellees did not confuse or mislead the public as to the source of origin of the goods they sold, and was not likely so to mislead and deceive; that appellees acted in good faith and without fraudulent intent, actual or constructive; and that the trial court's finding of their good faith and absence of fraudulent intent on their part, and the further finding that the public was not confused or deceived by them as to the source of origin of the goods was not clearly erroneous, but was supported by the evidence, and must be accepted and affirmed on appeal.

We come, then, to the discussion of the first of the two main issues: Appellant's claim that appellees infringed its trademark as registered under federal law.

In its complaint, appellant relied upon six federal registered trademarks of the name, "Johnson's"—

(1) For liquid wax polish for finishing and coating furniture and interior and exterior finished surfaces

(2) For wax for coating and polishing wood, metal, and other surfaces, automobile cleaner, and lacquer

(3) For wax for coating and polishing wood, metal, and other surfaces, and lacquer

(4) For brushes used in polishing waxed floors

(5) For powdered wax, prepared wax, wood-dye, paste wood-filler, varnish-remover, and floor cleaning chemicals

(6) For a household cleaner for cleaning Oriental and domestic rugs, upholstery, woolens, woodwork, Venetian blinds, walls, and tile.

These trademarks took the form of the name, "Johnson's," in block letters of different type, some with a mark like a square around them; or a square having a parallel line across it dividing it in two parts; or letters of the name in the form of a bow. These trademarks were affixed to containers for the goods, or the goods themselves. A number of other trademarks of appellant were marked for identification, but were never admitted in evidence.

We are, therefore, called upon to determine whether the above mentioned marks of "Johnson's" used on appellant's brushes to polish waxed floors, and on waxes, dyes, wood-fillers, varnish-removers, lacquers, floor-cleaning chemicals, and cleaning substances for rugs, upholstery, woolens, woodwork, Venetian blinds, walls, and tiles, are infringed by appellees' use of the name, "A Johnson Mop," or "Johnson Products Company" on its cotton wet mops and brooms, or in advertisements relating thereto.

A floor mop is such a common article of use—and always has been—that even a child knows what it is in general acceptation. What the generally accepted meaning of a floor mop is appears in standard works of reference, and is defined in Webster's New International Dictionary as: "An implement for washing floors, or the like, made of a piece of cloth, or a collection of thrums, or coarse yarn, fastened to a handle." Thrums, in this connection, is defined as "any loose, coarse yarn waste." In the Encyclopaedia Brittanica, a mop is defined as "A bunch of cloth rags or coarse yarn, fastened to a pole and serving as a broom or brush for swabbing up wet floors or other surfaces, and for cleaning generally."

Appellees' common wet mops are made of strings of yarn approximating a foot in length, affixed to a long handle. They are made and adapted for mopping floors with water and soap or similar cleaning substances. As above mentioned, appellant neither manufactures nor distributes nor sells common mops or brooms.

Appellant's wax appliers, which it contends are similar to appellees' mops, are not made of long strands of yarns. They are composed of a hard wooden or plastic head, affixed transversely to a long handle. The hard head is covered with lamb's wool, or short clipped strings of yarn. They are made for the purpose of dipping into liquid floor wax, and spreading such wax on a floor. They are not adapted to the mopping of floors with soap and water, and are not used for that purpose.

Appellant, in its advertisements, recognizes the difference between the use of mops and the use of its applicators. In its "Practical Hints," it recommends sweeping "your floors daily with a hair broom or wide dry cotton mop *to remove dirt and grit* * * *. If the accumulation of dirt is so heavy that sweeping won't remove it, mop your floor with a cotton mop dampened with cold water." Similar advice is contained in appellant's printed form, for public and industrial buildings, to be posted in "your janitor's supply room." Appellant, however, does not make or sell cotton mops or yarn mops for use with water for the purpose of cleaning a floor. For use in cleaning floors before the application of wax, appellant recommends its cleaning fluid, "Emerel," to be spread on floors, walls, or woodwork "with mop or rag, agitating it gently," and the removal of the dirt and liquid by the use of a mop or rag, * * * to remove all Emerel solution and dirt from [the] surface." Appellant thus recommends the use of a wet mop in cleaning floors, before the application of wax; but, in its long commercial history, it has never entered the business of making or selling such mops.

It seems reasonable to conclude that if, prior to this suit, appellant had been asked whether appellees' wet mops or brooms could be suitably or properly used to apply wax to floors, appellant's reply would have been in the negative, as the contrary would imply that its own specially made wax appliers, which it recommended for such use, were unnecessary; and the same reply could be expected if appellees were asked whether appellant's wax appliers could be properly used to mop or sweep a floor. The ordinary, intended uses of appellant's wax appliers are entirely dissimilar from the ordinary, intended uses of appellees' corn brooms and common wet mops. The fact that appellant sells, under its trade name, more than 250 widely diverse articles, and, in the course of seventy years of business in the sale of floor wax and implements to apply such wax to floors, has never suggested the use of a common wet mop for such application, seems a clear enough indication that such use would, in its own view, be improper, impractical, inefficient, and, perhaps, detrimental in achieving the results sought by appellant.

In its complaint, appellant claimed that it, and its antecedent partnership, had been, since 1900, engaged in the distribution and sale of a wide variety of products and appliances "for cleaning and polishing floors and other surfaces in homes and industrial establishments including mops, brushes, brooms, dusters, cleaning and polishing cloths and the like," and that "for more than thirty years [it] sold in interstate commerce and is still selling in such commerce cleaning appliances including long-handled mops carrying the trademarks 'JOHNSON' and/or 'JOHNSON'S.'" However, the testimony of appellant's officers was to the effect that appellant does not now, or never has, manufactured or sold a common wet mop or corn broom, or any item in either category. Appellant's products did not resemble common wet mops or corn brooms; and the sale of appellant's wax appliers or polishing brushes, which it claimed were of the same type as appellees' mops and brooms, had been discontinued long before the trial of the instant case, or had been initiated by appellant several years after appellees' mops and brooms had enjoyed nationwide distribution and sales.

In addition to the fact, above mentioned, that none of appellant's products, which it had ever sold, resembled appellees' wet mops and brooms, neither appellant's application for the registered trademarks nor the registrations issued by the Patent Office for appellant's products—as disclosed by the exhibits introduced in evidence—mentioned brooms or wet mops, or mops of any kind.

Although appellant never recommended or suggested the use of a mop for the application of wax to a floor, some of its competitors did suggest a "mop or applicator which has been predampened in clear cold water"; a "sponge mop"; a "cheesecloth mop"; or "a string mop." If applicators, such as those of appellant, with a hard head covered with lamb's wool or short clipped strings, are considered, by appellant's competitors, as "mops" for the application of wax, they cannot be said to resemble appellees' mops with long strands of cotton yarn for wet mopping and washing of floors. Moreover, the record does not disclose when appellant's competitors recommended such "mops" for the application of wax. They might have been so recommended after appellees had entered the business of manufacturing wet mops.

It has never occurred to appellant manufacturer of wax or to the minds of its experts in the application of such wax to floors, after fifty years of experience in the use of heavily weighted applicators and in light weight applicators with hard heads covered with short clipped strings or wool, that a cheap common wet mop with long strands of yarn had the same properties for the application of wax to floors as the specially constructed applicators. The fact that some persons are now found to be using such wet mops to apply wax, does not tend to prove, in the light of appellant's experience, expert knowledge, and recommendations to the public

with respect to the application of wax to floors—which omit any mention of the use of wet mops—that the specially made wax applicators are substantially the same as common wet mops. A broom's function in sweeping a floor is entirely different from that of an implement to spread wax, or to polish the floor; and the use of a mop for washing a floor is entirely different from that of an applicator in spreading wax.

While appellant's complaint, as above mentioned, stated that it had been, for a number of years, and was still engaged in selling and distributing mops and brooms in interstate commerce, the proofs do not sustain this allegation, and it is clear that it has never sold common corn brooms and common wet mops at any time.

It is emphasized by appellant that it has been engaged for many years in business in the "floor maintenance field"; "in the floor cleaning and maintenance materials and equipment trade"; "in the field of general household and industrial cleaning materials and equipment"; and "in the class of floor cleaning and polishing equipment and materials." On the argument, it was contended that although appellant had never manufactured, distributed, or sold corn brooms, it was entitled to a monopoly of the trademark, "Johnson's," as applied to such brooms, because it was entitled to the sole use of that name on all implements used in the "floor maintenance field."

■ We are of the view that this claim covers too broad a field, and cannot be sustained. The right granted to the owner of a registered trademark is a monopoly and should not be extended unless the owner is clearly entitled thereto. Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., D.C.N.Y., 24 F.Supp. 481, affirmed 2 Cir., 105 F.2d 908, certiorari denied 308 U.S. 616, 60 S. Ct. 262, 84 L.Ed. 515.

In this controversy, arguments are presented with respect to a problem that has been discussed in various cases, and concerning the solution of which authorities differ.

In the Federal Trade-Mark Act of 1905, 33 Stat. 728, the test of infringement depended upon whether the goods in connection with which the mark was used consisted of "merchandise of substantially the same descriptive properties as those set forth in the registration."

The Lanham Act of 1946, Title 15 U.S. C.A. § 1051 et seq., here involved, however, does not limit infringement to the use of a mark on goods which are "of substantially the same descriptive properties as those set forth in the registration." It does provide that in order to secure a registered trademark under federal law, an owner must file a written, verified application in the Patent Office; that in the application, he specify the mark; that he further specify the goods in connection with which the mark is used; and the mode and manner in which the mark is used in connection with such goods. Title 15 U.S.C.A. § 1051.

Moreover, the certificate of registration issued by the Patent Office is required to state the particular goods for which it is registered. Title 15 U.S.C.A. § 1057.

In addition to other changes, the Lanham Act substituted for the language in the older acts, limiting infringing sales to those of goods which were "of substantially the same descriptive properties as those set forth in such registration," a recovery for a use "likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services." 15 U.S.C.A. § 1114 (1).

Does this change in the language of the Lanham Act abolish the criterion that infringement depends on the use of the mark on goods which are "of substantially the same descriptive properties as those set forth in the registration"? It was held in California Fruit Growers Exchange v. Sunkist Baking Co., 7 Cir., 166 F.2d 971, 974, "The trade-marks should be confined substantially to the articles for which they were authorized, otherwise, why limit the marks at all? Before a trade-mark can be granted un-

der the applicable Lanham Act, the application therefor must name the products to which it is to apply." Should an owner of a mark be given a recovery for a use "likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods and services," as provided by the Lanham Act? In S. C. Johnson & Son, Inc., v. Johnson, 2 Cir., 175 F.2d 176, 180, it was held: "[It] is far from true that the mere fact of confusion between the two users should always and itself tip the scales in favor of the first. * * * [We] tried to show how the power of a first user to establish such a premonitory lien upon a future market might lead to great injustice. In deciding such 'interstitial' issues, which legislatures at times wisely leave to them, courts are obliged to take over their function pro hac vice and to decide which of the conflicting interests they think should prevail."

In Federal Telephone & Radio Corp. v. Federal Television Corp., 2 Cir., 180 F.2d 250, 251, it was said: "Although there appears to be a persistent belief that the first use of a specific name or description gives a power to the first user to prevent its use by others, it is important to remember that no such doctrine exists. In all such cases there is only one question: what damage to the first user will the second do by the use of the first user's mark, or name or make-up, and what burden will it impose upon the second user effectively to distinguish the goods?"

It has been held that the right to the exclusive use of a technical trademark is limited to a use of it upon some particular class of goods, Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 6 Cir., 119 F.2d 316; and that the exclusive right to the use of a trademark is limited to use on the class of goods for which it was registered, as set forth in the application filed, and to merchandise of substantially the same descriptive properties. Such a registered trademark, it is held, is limited by its claim, and the applicant is concluded by the statement in his application. Walgreen Drug Stores, Inc., v. Obear-Nester Glass Co., 8 Cir., 113 F.2d 956. It has been further held that the fact that goods are household articles does not mean that they have the same descriptive properties, prohibiting registration of a mark that is identical with a registered, or known trademark, owned and used by another, and appropriated to the merchandise of the same descriptive properties, Pratt & Lambert v. Chapman & Rodgers, 136 F.2d 909, 30 CCPA 1228; and it would follow that because articles and substances are used in the "floor maintenance field" does not mean that they have the same descriptive properties.

Under the above authorities, the issue would be whether appellant's waxes, lacquers, polishes, automobile cleaners, wood-dyes, varnish-remover, floor-cleaners, and brushes for polishing wax floors have substantially the same descriptive properties as appellees' common wet mops and corn brooms.

The district court found, as a fact, that appellant had no registered trademark for the use of the name, "Johnson" or "Johnson's," on a common wet mop of the descriptive properties as that made and sold by appellees, and that it had never made or sold a cotton wet mop or corn broom of the same descriptive qualities as those manufactured and sold by appellees. In its conclusions of law, the district court held that the registration of a particular mark represents that the mark will be used in a certain field which is reasonably circumscribed by the nature of the product in connection with which the mark is to be used, and that appellant's use of the word, "Johnson's," should be confined substantially to the articles for which it had been authorized under the registrations issued by the Patent Office.

"We have stated the problem. Fortunately, this litigation does not drive us into a corner where we must solve it in order to settle the case. * * * [There] was no unfair competition. * * * The Trial Judge found as a matter of fact that 'no intelligent purchaser using reasonable care would be confused

as between the goods of [the parties].' There was considerable evidence on this point of confusion and the record is full of reports of a series of tests conducted in different retail stores. We are satisfied with the fact conclusion of the Trial Judge on this point." Campbell Soup Co. v. Armour & Co., 3 Cir., 175 F.2d 795, 797, 799.

■■ In the controversy before us, however, it is not necessary to reconcile these adjudications with particular provisions of the Lanham Act, or to consider whether they have been superseded by that statute. We are not required here to determine whether infringement is limited to the use of a mark on goods which are "of substantially the same descriptive properties as those set forth in the registration"; nor are we obliged to decide whether appellant in this case has, regardless of inconsequential damage, a right of recovery for appellees' use of the name, "Johnson," on the ground that it was a use "likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods and services." The crucial determination of the trial court was its finding that appellees' use of the name did not cause, and was not likely to cause confusion or mistake or to deceive purchasers as to the source of origin of their goods. Such findings must be accepted on appeal unless clearly erroneous; and, as stated more fully in this opinion later on, upon a similar issue, we are of the view that the court's findings were not clearly erroneous, but were sustained by the evidence.

The trial court also held that under the Lanham Act, the right to the exclusive use of a registered trademark is to be limited to the particular description of the goods described in the application; and that it is only as to the goods described in an application, and on which a trademark is to be affixed, that the owner is entitled to protection of his mark. In considering what the Supreme Court, in Steele v. Bulova Watch Co., 344 U.S. 280, 283, 73 S.Ct. 252, 254, 97 L.Ed. 252, referred to as "this complex and controversial Act," we are not required, in disposing of this case, to pass upon the question whether the right to the use of a registered trademark is to be limited to the particular goods described in the application and whether it is only as to the goods described in the application and on which a trademark is to be affixed, that the owner is entitled to protection. See, however, Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co., 8 Cir., 199 F.2d 407, and Faciane v. Starner, 5 Cir., 230 F.2d 732. Whether the right of a trademark is limited to the particular goods described in the application to the Patent Office; whether it is only as to the goods so described, on which a trademark is to be affixed, that the owner thereof is entitled to protection; whether the owner is entitled to recover for appellees' use of his name on the ground that it was a use likely to cause confusion or mistake, or deceive purchasers as to the source of origin of such goods, regardless of whether such confusion was inconsequential—these questions are unnecessary to decide. For, as heretofore said, the trial court found as a fact that appellees' use of the name did not cause, and was not likely to cause, confusion, or mistake, or deceive purchasers as to the source of origin of their goods. Therefore, without expressing a view on what the district court said as to the right of recovery in case of confusion where the damage was only inconsequential, as well as its opinion as to the limitation of the protection of a trademark to the particular goods described in the application to the Patent Office—and without intimating any error in the views so expressed by the district court—we consider that, in any event, the findings and conclusions with respect thereto are, as far as this case is concerned, at most, superfluous.

We come, then, to the issue whether appellees have infringed appellant's common law trademarks; and much of the foregoing with respect to the federal registered trademarks is applicable to the subject of common law trademarks.

Appellant contends that for many years, it has established and continuously maintained, in the household and industrial maintenance equipment and material trade, and, more specifically, in the floor maintenance equipment and material trade, a common law property in the trademark, "Johnson's," the scope of which has never diminished, but has become broader with the increase in the scope of appellant's business; and that, at all times during the past fifty years, appellant has sold "a substantial number of applicators for applying cleaning and polishing liquids and related equipment."

■ It is contended by appellant that the use by appellees of the phrase, "A Johnson Mop," and the name, "Johnson Products Company," will, and does, lead the public to understand that its goods are the product of appellant, and that the profit of the confusion was known to, and intended by, the appellees; and that such use of the phrases and names by appellees infringes on appellant's common law trademark, "Johnson's." This is the law where the use of such name by a newcomer is made with fraudulent intent, L. E. Waterman Co. v. Modern Pen Co., 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142; or where such use is constructively fraudulent, King Pharr Canning Operations v. Pharr Canning Co., D.C.Ark., 85 F. Supp. 150.

■ The law, however, recognizes and supports the right of every individual to his own surname in his own trade or business so long as it does not work either an actual or constructive fraud upon the complaining party or the general public; for the law of trademarks is but a branch of the law of unfair competition, the purpose of which is to prevent one person from passing off his goods or his business as the goods and business of another. Kroll Bros. Co. v. Rolls-Royce, 126 F.2d 495, 29 CCPA 897; United Drug Co. v. Obear-Nester Glass Co., 8 Cir., 111 F.2d 997; Bulova Watch Co. v. Steele, 5 Cir., 194 F.2d 567. It was originally designed to protect the mark's owner from diversion of customers who would have otherwise bought of him.

S. C. Johnson & Son, Inc. v. Johnson, 2 Cir., 175 F.2d 176. A trademark only gives the owner thereof the right to prohibit its use to deceive the public in a manner which injures his good will, Sunbeam Corp. v. Payless Drug Stores, D.C. Cal., 113 F.Supp. 31; and it has been held that the mere fact that one person has adopted and used a trademark on his goods does not prevent the adoption of the same trademark by others on articles of a different description, Mont-O-Min Sales Corp. v. Wyeth, Incorporated, D.C. Mo., 92 F.Supp. 150. The Lanham Act and the law of unfair competition protect the monopoly of a registered descriptive trademark only against the unfair competition of one who seeks, by the use of a similar mark, to palm off his products as those of the owner of the trademark. Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co., 8 Cir., 199 F.2d 407.

Appellant contends that appellees have been guilty of unfair competition infringing its common law trademark, by using appellees' surname (1) to induce purchasers or prospective purchasers to believe that appellees' goods emanate from or in some way are connected with appellant; and (2) to cause deception, mistake, or confusion of purchasers as to the source of origin of appellees' goods, all to the damage of appellant. It is not specifically averred that appellees palmed off their goods as the goods of appellant, or attempted to do so, but that is the implication and the inference fairly to be drawn.

In order to show that appellees' use of the phrase, "A Johnson Mop," and the name, "Johnson Products Company," infringed its trademark, appellant introduced the testimony of a number of witnesses who were employed by it to make surveys, as well as persons interviewed by them. The first witness on this phase of the case was a cashier at a large chain drug store. She testified that she had been interviewed by appellant's agent; that although she used a wet mop in her house, she had never heard of a Johnson wet mop. She further stated that, in answer to a question whether she knew

of anything else "this company makes," she answered: "Wax, I suppose." One of appellant's interviewers for the survey testified that she was required to ask various persons certain questions; that she had a small picture of appellees' wet mops which she showed them at the time of questioning. Some would notice that it was made in Memphis, and would state that they did not know what that company made. This particular interviewer further testified, on cross-examination, that she customarily applied Johnson wax to her kitchen floor; that she never used a wet mop for that purpose, but, rather, a wax applicator; that she did not know of any of her friends that used such a mop to apply wax to a floor; that it was hard for a mop to get into the corners; and that she never heard of anyone using a wet mop to apply wax to floors. Another interviewer testified that she used a small applicator made out of string, which was sold with the wax, to apply wax to floors; that she had heard one—and only one—of her acquaintances say at a PTA meeting, where they were all discussing the survey, that she used a wet mop to apply wax; that as far as the people she interviewed, who made use of wet mops for washing floors, none of them knew what brand they used. The foregoing testimony was the only evidence disclosing, even by hearsay, a housewife's using a wet mop to apply wax to a floor.

Another interviewer testified that she asked a clerk in a store: "Is this Johnson's mop made by the company that makes Johnson's wax?" and the clerk replied: "I don't know. I suppose so. It says Johnson Products on the label." Another clerk in a store was asked the same question and replied: "Yes, it is. I'm sure. We handle all their products" —then asking another clerk, "Isn't that right? Yes, I'm sure of that." Another clerk answered: "Yes, it is." Still another clerk at a different store answered: "Yes, it is. I am sure of it." The witness then went on to say that the clerk hesitated and continued: "Yes, it is, I am sure it is." At another store, a clerk answered the question by saying: "Yes, I think it is"; another, "Yes, it says so on the label" (which was not the case). The person in charge of the survey testified that in the report of this interviewer, thirteen other persons answered, generally, "as the witness has testified"; two or three said, "No, it is not made by the company that makes Johnson's wax"; and one said, "I don't know." Another, in answer to the question, said: "I believe it is"; another, "Yes, it is"; another, "I believe they are both the same company"; another, "Yes, I think so, yes." The foregoing are generally characteristic of the answers given to the interviewers making the survey. When the interviewers asked different persons about a Johnson wet mop, they showed them a small picture of such a mop instead of the long cotton string mop itself; and appellant's representative who conducted the survey testified that, although in prior surveys, he had shown the actual product to the persons interviewed, he refused to agree that it would have been better to have actually shown one of appellees' mops instead of a small picture of one, even though he had been more interested in the mops themselves than the labels they bore. He further stated that he thought, in this case, showing a picture was sufficient as he was primarily interested in the name, "Johnson," on the mop, and not the type of mop on which it was used; and in compiling the answers to the questions asked in the survey he showed a variety of answers, purporting to disclose confusion and deception practiced by the appellees in using the name, "Johnson," in the sale of their mops.

Other witnesses in the household appliance business testified that wet mops and applicators were not competitive, and that they would never recommend a wet mop for the application of wax to a floor. Appellant's applicators and appellees' wet mops were sometimes displayed in stores in the same racks, because, as the store proprietors said, they both had long handles, and the racks were adapted to hold long-handled implements. In many

cases, however, appellant's products were displayed in a rack designed by appellant, in which the words, "Wax Applier," were in such large letters that they were readily distinguishable as appellant's products a considerable distance away. It appeared that, sometimes, wet mops were used to apply wax in large rooms in public and industrial buildings because of the extent of the areas to be covered; but they were not recommended for such a purpose by appellant; and appellees, until the trial, had never heard of their long wet mops being used for the application of wax to a floor. It further appeared that only five per cent of appellees' wet mops were sold to industrial institutions, and, of this five per cent, it appeared that only one per cent to five per cent, might have been used to apply wax.

The evidence as to the use of a wet mop to apply wax to a floor in a dwelling house could be said to be nonexistent. The questions asked of the public in taking the survey above mentioned were: (1) Do you use a wet mop in your home? (2) Have you ever heard of a Johnson wet mop? (3) Have you ever owned one? (4) Do you know what else this company makes? (5) (If "Yes") What? The question, in such a survey, which, from appellant's standpoint, would seem to be crucial, would have been: "Do you use a wet mop to apply wax to the floor of your home?" This question was not asked. It may be that the reason was that no witness could be found who ever used a wet mop in this way; and appellee Phil Johnson may have supplied the reason why such a question was not asked when he testified that a wet mop, before it could be used, would absorb a pint of wax, and that, at 89 cents a pint, this method of application of wax to a kitchen floor would be too expensive for a household.

██ The owner of a trademark is not entitled to a guarantee against confusion in the minds of careless and indifferent buyers, Mishawaka Rubber & Woolen Mfg. Co. v. Panther-Panco Rubber Co., D.C.Mass., 55 F.Supp. 308; and merely occasional cases of confusion or thoughtless errors by very inattentive purchasers are of very little significance in trademark and unfair competition cases. Pennzoil Co. v. Crown Central Petroleum Co., D.C.Md., 50 F.Supp. 891, affirmed 4 Cir., 140 F.2d 387. Nevertheless, evidence of actual confusion is not necessary to show that likelihood of such confusion of marks exists as to preclude registration of such marks. Salem Commodities, Inc., v. Miami Margarine Co., 244 F.2d 729, 44 CCPA 932.

It is, of course, not necessary that the "palming off" of the goods be intentional. The right of an individual to use his own name in conducting his business is coupled with the duty not to use the name so as to pass his goods off for those of another with resulting injury to such person, and with resulting deceit of the public, whether the passing off is intentional or the necessary result of selling goods under such name. King Pharr Canning Operations v. Pharr Canning Co., D.C.Ark., 85 F.Supp. 150.

On the issue of infringement of the common law trademarks, as in the case of the registered trademarks, the findings of the trial court, as we view it, are here conclusive.

The district court found that there was confusion in the public mind as to appellant's corporate name and the products manufactured and sold, or purchased, labeled, and sold by it, but that such confusion was, in a large measure, accounted for by the fact that Johnson is a common surname, and appellant had not taken any steps to distinguish it from others using the same name. There was no confusion as to the source of origin, however. The court concluded that it is always possible, when two merchants use the same name, that some confusion may arise and that the reputation of one may, therefore, be transferred to the other; but that there was no substantial basis for such a conclusion in the instant case. The court, while holding that there was no basis for any conclusion that appellees had profited by any such kind of confusion, said that whatever confusion may have resulted, which would be slight at most, "if, in fact, it does exist, does not warrant enjoining appellees from using their own

surname in their trade or business where they are guilty of no fraud or other improper practice in doing so," and that appellees had "made reasonable efforts to identify clearly themselves as manufacturers of their own product."

■ The district court found that appellees had adopted the name, "Johnson," for use on their wet mop in good faith and not with any fraudulent purpose of attracting to themselves business or sales which belonged to the appellant.

■ While fraudulent intent is not an essential element of infringement of a trademark, it is entitled to consideration. Broderick & Bascom Rope Co. v. Manoff, 6 Cir., 41 F.2d 353. Motivation is an important factor in the determination of such an issue. Trademark infringement does not depend upon a fraudulent intent; and good faith is no defense, if the mark used is likely to result in confusion or mistake. But the court has the right, in determining the likelihood of confusion, to consider the motive of the party who adopts the mark. In determining the likelihood of consumer confusion by the use of words similar to the trademark allegedly infringed, an intent on the part of the claimed infringer to palm off his goods as those of another is a relevant factor to be carefully weighed with other factors. Maternally Yours, Inc. v. Your Maternity Shop, Inc., 2 Cir., 234 F.2d 538. In the instant case, the question of appellees' intent was given careful consideration by the trial judge.

The district court's finding that appellees acted in good faith and without fraudulent intent differentiates the instant case, on this aspect, from numerous adjudications on which appellant relies —all of which disclosed fraudulent intent, constructive fraud, or inequitable conduct on the part of the user of a mark or name.

■ The district court further found that there was no substantial evidence that the public or any purchasers were confused or deceived, or likely to be confused or deceived, into purchasing appellees' wet mops in the belief that they were the products of appellant; and that appellees had not attempted, in any way, to palm off their goods as the goods of appellant, but that, on the contrary, they had made reasonable efforts clearly to identify themselves as manufacturers of this product.

These were questions of fact. With regard to the surveys made—which, if favorably interpreted, might be said to sustain appellant's claim of confusion— and the evidence introduced by appellees —which was to the contrary—the trial court was, in such a conflict, the judge of the credibility of the witnesses and the weight of the evidence. It could itself appraise the exhibits, including the wax appliers, the mops, brooms, labels, packaging, and the like, and reasonably conclude that many of the questions asked in the survey suggested answers favorable to appellant's contention; that the answers of many of the others interviewed were doubtful, uncertain, and careless; and the court, acting as the finder of the facts, could, accordingly, determine, and did determine that appellees had not attempted to palm off their goods as the goods of appellant, and that there was no substantial evidence that the public or any purchasers were confused or deceived into purchasing appellees' wet mops in the belief that they were the products of appellant.

Where a district court's findings and conclusions that a defendant had no guilty knowledge or fraudulent intent to deceive or pass off its products as those of the plaintiff, that there would be no confusion, mistake, or likelihood thereof as to the source of origin of the parties' respective products, and that defendant's labels or marks did not infringe plaintiff's trademark, were not clearly erroneous, but were supported by substantial credible evidence, an affirmance of a judgment for the defendant thereon is required. Squirrel Brand Company v. Barnard Nut Company, 5 Cir., 224 F.2d 840.

■ The trial court's findings and conclusions must stand on appeal, unless

clearly erroneous. They are not clearly erroneous unless the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake was committed; and the burden is upon appellant to show such a mistake. ibid. It is our view that the findings and conclusions of the district court were not clearly erroneous but that, on the other hand, they were sustained by ample evidence.

In accordance with the foregoing, the judgment of the district court denying appellant's prayer for injunctive relief, and dismissing the complaint, is affirmed.

This case was argued to a panel of the court consisting of McALLISTER, MILLER, and STEWART, Circuit Judges. Judge STEWART became an Associate Justice of the Supreme Court of the United States before a decision was reached or this opinion was prepared. He, therefore, did not participate in the decision, opinion, or judgment in this case.