**MIDWEST GUARANTY BANK,**
**a Michigan corporation,**
**Plaintiff,**

v.

**GUARANTY BANK, a Wisconsin**
**corporation, Defendant.**

No. 02–CV–74722–DT.

United States District Court,
E.D. Michigan,
Southern Division.

June 5, 2003.

George T. Schooff, Troy, MI, for plaintiff.

Mark Cantor, Southfield, MI, for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

BORMAN, District Judge.

Now before the Court is Plaintiff Midwest Guaranty Bank's motion for prelimi-

nary injunction. The Court held an evidentiary hearing on May 27, 2003 and heard final oral argument on May 28, 2003. Having considered the entire record, and for the reasons that follow, the Court GRANTS Plaintiff's motion for preliminary injunction. Specifically, pending a final trial on the merits. Defendant Guaranty Bank is hereby RESTRAINED and ENJOINED from using the mark GUARANTY BANK in conjunction with its banking and related financial services offered in southeast Michigan. Defendant Guaranty Bank, however, shall have 30 days from the date a security bond is posted by Plaintiff Midwest Guaranty Bank to terminate its operations under the name Guaranty Bank.

## FACTS

The underlying facts giving rise to this litigation are relatively straightforward. Plaintiff, Midwest Guaranty Bank ("Midwest Guaranty" or "Plaintiff") has provided financial services and products to Michigan customers since 1989.[1] (Compl.¶ 7–9.) Midwest Guaranty has five Detroit metropolitan area branches located in Troy, Beverly Hills, Livonia, Bloomfield Township, and Farmington Hills, Michigan. (Id.; Maxson Dec. ¶ 12.)

Defendant Guaranty Bank ("Guaranty" or "Defendant"), based in Wisconsin, has been providing retail banking and residential mortgage services since 1923. (Def.'s Prel. Inj. Resp. Br. at 6.) Specifically, Guaranty began operating under the name "Guaranty Building and Loan Association" in 1923. It operated under this name until 1951, when it changed its name to "Guaranty Savings & Loan Association." In

February, 1989, Guaranty, once again, changed its name, this time to "Guaranty Bank for Savings, S.A." This name only lasted for approximately one year; in May, 1990, Guaranty changed its name to "Guaranty Bank, S.S.B." Finally, in June, 2002, Guaranty converted to a federal savings bank under the name "Guaranty Bank." (Pl.'s Exh. 75.)

Approximately five years ago, Guaranty opened a "convenience banking location" in a Kohl's supermarket in Mequon, Wisconsin. Guaranty subsequently opened additional banking locations in other Kohl's supermarkets. (Id.) After years of discussions, Guaranty decided, in 2002, to expand its in-store banking business into Michigan, executing agreements with both the Farmer Jack and Kroger supermarket chains. (Id. at 7–8.) Guaranty has opened banking locations in the Detroit metropolitan area and is planning further expansion into this market. According to Guaranty Chairman Gerald Levy's testimony at the May 27, 2003 evidentiary hearing, Guaranty has now opened twenty in-store branches in southeast Michigan, and intends to open approximately twenty more in-store branches in the near future.

Midwest Guaranty contends that Guaranty's use of the name Guaranty Bank has created a likelihood of confusion among Midwest Guaranty customers and others as to the source of Guaranty's financial services and products, as well as the financial services and products of Midwest Guaranty. (Id. ¶ 17.) Midwest Guaranty has documented numerous misdirected phone calls and other inquiries intended for Guaranty Bank, and/or Midwest Guar-

---

1. According to Clarke Maxson, President, CEO and co-founder of Midwest Guaranty, the bank is "a community bank that offers a wide range of financial services to both individual consumers and business." "Financial services offered by Midwest Guaranty Bank include, but are not limited to, adjustable rate mortgages, home equity loans, 15/30 year fixed rate mortgages, construction loans, jumbo loans, personal checking and savings accounts, automobile loans, boat loans, and personal loans." (Pl.'s Prelim. Inj. Br. Exh. 1—Maxson Declar. ¶ 13–14.)

anty customers mistakenly assuming that Guaranty was part of Midwest Guaranty.

Midwest Guaranty filed the instant four-count complaint on November 26, 2002: Count I—Lanham Act § 43(a) Unfair Competition [15 U.S.C. § 1125(a)]; Count II—Common Law Unfair Competition; Count III—Common Law Trademark Infringement; and Count IV—Violation of the Michigan Consumer Protection Act M.C.L.A. § 445.903.

On January 29, 2003, Midwest Guaranty filed the instant motion for preliminary injunction. The parties filed proposed findings of fact and conclusions of law on Friday, May 23, 2003. The Court held an evidentiary hearing on Tuesday, May 27, 2003, and heard final oral argument on Wednesday, May 28, 2003. Having considered the entire record, including the testimony and evidence presented during the evidentiary hearing, the Court is now prepared to rule on Midwest Guaranty's motion for preliminary injunction.

## ANALYSIS

### A. Preliminary Injunction Standard

The granting of a preliminary injunction is committed to the sound discretion of the trial court. *United States v. Any And All Radio Station Transmission Equip.*, 204 F.3d 658, 665 (6th Cir.2000). The plaintiff has the burden of proof in seeking an injunction. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256 (6th Cir.1968). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir.2002); *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir.

2000) (noting that a "preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied "only in [the] limited circumstances" which clearly demand it.' ").

■ A court must consider four factors when deciding whether to issue a preliminary injunction: (1) whether the plaintiff has a strong likelihood of succeeding on the merits; (2) whether the plaintiff will suffer irreparable injury absent the injunction; (3) whether issuing the injunction will cause substantial harm to others; and (4) whether the public interest will be furthered by the issuance of the injunction. *Gonzales v. National Bd. Of Med. Examiners*, 225 F.3d 620, 625 (6th Cir.2000). These considerations are merely factors to be balanced, "not prerequisites that must be met." *Teamsters Local Union 299 v. U.S. Truck Co. Holdings*, 87 F.Supp.2d 726, 733 n. 2 (E.D.Mich.2000) (quoting *Mascio v. Public Employees Retirement Sys. of Ohio*, 160 F.3d 310 (6th Cir.1998)). However, a finding that there is no likelihood of success on the merits is usually fatal. *Gonzales*, 225 F.3d at 625.

### B. *Tea Rose–Rectanus* Doctrine—Mark Priority

■ As a threshold matter, Guaranty contends that it has priority in the "Guaranty Bank" service mark because it has been using the "Guaranty" name since 1923, well before Midwest Guaranty began using the "Midwest Guaranty" mark in 1989, citing the *Tea Rose–Rectanus* doctrine established by two U.S. Supreme Court cases—*Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916) and *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). The Court disagrees.

Neither party to this case has filed a state or federal trademark registration. At common law, ownership of service marks is obtained by actual use. *Allard Enterprises v. Advanced Programming Resources, Inc.*, 249 F.3d 564, 571 (6th Cir.2001) (citation omitted). "The first to use a mark in the sale of goods or services is the 'senior user' of the mark and gains common law rights to the mark *in the geographic area in which the mark is used.*" *Id.* at 572 (emphasis added). This principle was recognized long ago by the U.S. Supreme Court in *Hanover Star Milling* and *Rectanus*. As noted by a District Court in the Western District of Pennsylvania:

> [W]here two users operate in geographically remote markets, prior appropriation is legally insignificant. [*ACCU Personnel*, 846 F.Supp.] at 1205. This is because each user attains rights in the mark in the remote market according to actual use. Thus, a senior user enters a remote market subject to the trademark rights already acquired, in good faith, by another user. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *Hanover Star*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (the *Tea–Rose* case); *see also* Restatement (Third) of the Law of Unfair Competition § 19 (1995). This principle, known as the *Tea–Rose/Rectanus* doctrine, governs territorial rights in unregistered trademarks and permits a junior user to enjoin a senior user's infringing use "in an area where the senior user has no established trade, and hence no reputation and no good will." *Natural Footwear*, 760 F.2d at 1394; *see*

*generally* 4 *McCarthy on Trademarks* Ch. 26, *passim* ("The Territorial Extent of Trademark Rights"). The *Tea–Rose/Rectanus* doctrine applies to infringement actions premised on § 43(a) of the Lanham Act. 4 *McCarthy on Trademarks* § 26.4, at 26–9–10.

*Laurel Capital Group v. BT Financial Corp.*, 45 F.Supp.2d 469, 481–82 (W.D.Pa. 1999).

Guaranty Bank did not "actually use", in the trademark sense, its mark in the relevant geographic market (southeast Michigan), before Midwest Guaranty adopted its mark in 1989. Guaranty claims that since the early 1980's, it was originating and servicing mortgage loans under the "Guaranty Bank" mark in approximately 40 states, not including Michigan, and that its name appears in closing documents as a servicer of such loans. (Gerald J. Levy Declaration ¶ 5–6.) Mr. Levy's declaration is deceptively insufficient—no mention is made of significant loan originations in Michigan before 1989 (only loans in 40 states since the early 1980's). In fact, Midwest Guaranty filed the declaration of Gary Mielock, former Commissioner of the Michigan Financial Institutions Board,[2] who states that until at least June, 2002, Guaranty Bank would have been required to obtain a Certificate of Authority from the Commissioner in order to conduct business in Michigan—no such Certificate was issued. (Mielock Declaration ¶ 20–21.) This was confirmed by Gerald Levy's own testimony during the evidentiary hearing—Guaranty had not obtained a Certificate of Authority to do business in Michigan.

---

**2.** Guaranty filed an objection to Mr. Mielock's declaration. Guaranty argues that the declaration does not comply with Federal Rule of Civil Procedure 26(b)(2)(B), dealing with pretrial expert disclosures. Given the expedited nature of a preliminary injunction hearing, Mr. Mielock's declaration will be permitted for the limited purpose of deciding the instant motion. Both parties must comply with Rule 26(b)(2), before trial, as provided in the Rules. Moreover, the declaration will be permitted, notwithstanding any minor technical deviation from 28 U.S.C. § 1746.

■ Furthermore, the fact that a "Guaranty" mark[3] might appear at some point in a voluminous set of mortgage closing documents does not create, without more, trademark reputation or goodwill in southeast Michigan. Finally, the fact that Gerald Levy spoke, on one single occasion in 1985 (four years before Midwest Guaranty's formation in 1989), at the Michigan League of Savings Institutions' annual meeting on Mackinac Island, does not provide any basis for concluding that Midwest Guaranty adopted its service mark, in 1989, in bad faith (particularly since, in 1985, Guaranty was known as "Guaranty Savings and Loan"). Simply stated, no evidence exists in the record which would provide any basis for concluding that Guaranty used its mark in Michigan, or had generated any trademark source recognition in southeast Michigan before Midwest Guaranty's entry and continuous use of its mark in southeast Michigan in 1989. As such, Midwest Guaranty acquired common law rights in "Midwest Guaranty Bank" prior to any actual use by Guaranty of its service mark in the relevant geographic area—southeast Michigan.

## C. Strong Likelihood of Success On The Merits

■ As previously noted, Midwest Guaranty's Complaint sets forth four counts: Count I—Lanham Act § 43(a) Unfair Competition [15 U.S.C. § 1125(a)];[4] Count II—Common Law Unfair Competition; Count III—Common Law Trademark Infringement; and Count IV—Violation of the Michigan Consumer Protection Act M.C.L.A. § 445.903. Both parties acknowledge that in order for Midwest Guaranty to prevail on its State and Federal claims, it must establish that Guaranty's service mark is likely to cause confusion among consumers in the marketplace. *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 833 (6th Cir.1983); *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1105 n. 1 (6th Cir.1991) [hereinafter *"Homeowners"*].

■ The Sixth Circuit has identified eight factors that are relevant in determining whether a likelihood of confusion exists in a particular case: (1) the strength of the plaintiff's mark, (2) the relatedness of the

3. As noted *supra*, Guaranty did not use the simple "Guaranty Bank" mark in 1989; Guaranty was known as "Guaranty Bank for Savings, S.A." In fact, in 1999, Guaranty, when defending its own local common law trademark rights against "Guaranty Federal Savings Bank," stated:

> Please be advised that the name "Guaranty Bank" is presently being used by Guaranty Bank, S.S.B., a Wisconsin state savings bank and has been in continuous use by Guaranty Bank, S.S.B. since its conversion to state savings bank charter in *1993*. Formerly, Guaranty Bank, S.S.B. was know as *Guaranty Savings and Loan*. Guaranty Savings and Loan was established in 1923.

(Pl.'s Exh. 82) (emphasis added).

4. Specifically, 15 U.S.C. § 1125 provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any contain-

er for goods, uses in commerce any word, ·term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

goods or services offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels used by the parties, (6) the probable degree of purchaser care and sophistication, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line using the marks. *Therma–Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir.2002) [hereinafter *"Therma–Scan"*] (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997)). When analyzing these factors, the Court must evaluate the performance of the marks in the commercial context. *Homeowners*, 931 F.2d at 1106 (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1266 (6th Cir.1985)). The Sixth Circuit has cautioned, however, that the factors are simply a guide, not a mathematical formula to be rigidly applied by the Court. *Therma–Scan*, 295 F.3d at 630. Furthermore:

> Not all of these factors will be relevant in every case, and in the course of applying them, "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."

*Id.* (quoting *Homeowners*, 931 F.2d at 1107.)

---

**5.** These "categories constitute a spectrum of increasing strength and are not perfectly discrete." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997) (citation omitted).

**6.** As noted by a respected commentator:

> Under the anti-dissection rule, a composite mark is tested for its validity and distinctiveness by looking at it as a whole, rather than dissecting it into its component parts. As the U.S. Supreme Court stated: "The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in de-

### 1. Strength of Plaintiff's Service Mark

■ The strength of Midwest Guaranty's service mark is determined by the mark's distinctiveness and the degree of recognition in the marketplace. *Homeowners*, 931 F.2d at 1107. The Sixth Circuit has commented that a mark's strength is generally a result of (1) its unique nature; (2) its owner's intensive advertising efforts; and (3) which of the four categories the mark occupies—generic, descriptive, suggestive or arbitrary/fanciful.[5] *Therma–Scan*, 295 F.3d at 631.

■ Here, Midwest Guaranty claims a protectable interest in the overall mark "Midwest Guaranty Bank." The word "bank" is a generic term incapable of protection by itself. *First Savings Bank v. First Bank Sys., Inc.*, 101 F.3d 645, 655 (10th Cir.1996); *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir.1984). Similarly, the word "Midwest" is a geographically descriptive term and is thus, inherently weak. *Union Nat'l Bank of Texas, Laredo, Texas v. Union Nat'l Bank of Texas, Austin, Texas*, 909 F.2d 839, 845 (5th Cir.1990). Therefore, absent proof of secondary meaning, these terms, standing alone, would not be subject to protection.

■ Midwest Guaranty argues, however, that insertion of the term GUARANTY renders the overall mark suggestive rather than merely descriptive.[6] (Pl.'s

---

tail. For this reason it should be considered in its entirety."

However, it is not a violation of the anti-dissection rule to separately view the component parts as a preliminary step on the way to an ultimate determination of probable customer reaction to the composite as a whole. As the Trademark Board observed:

> It is perfectly acceptable to separate a compound mark and discuss the implications of each part thereof with respect to the question of descriptiveness provided that the ultimate determination is made on the basis of the mark in its entirety. An Examining Attorney's discussion of

Reply Br. at 4 n. 5.) A descriptive term describes a characteristic or ingredient of an article. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir.1996) (citation omitted) (identifying, for example, "best," "superior," or "preferred"). A suggestive term on the other hand, suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods. *Id.* (for example, "Citibank" which connotes an urban or modern bank).

■ According to Black's Law Dictionary, "guaranty" means "a collateral agreement for performance of another's undertaking. An agreement in which the guarantor agrees to satisfy the debt of another (the debtor), only if and when the debtor fails to repay (secondary liable)." BLACK'S LAW DICTIONARY 705 (Deluxe 6th ed.1990). While use of the term "guaranty" may be descriptive, for example, of bank deposits insured by the Federal Deposit Insurance Corporation in the event of a bank's failure, it is not generally descriptive of banking and other financial services (mortgages, etc.) performed by the parties. Instead, as acknowledged by Guaranty's counsel during final oral argument, the term suggests that the consumer should trust and feel secure that their money is safe, and thus is more suggestive than descriptive. The Court agrees with Midwest Guaranty that the term "guaranty" is suggestive in this context.

■ This conclusion—that Midwest Guaranty's mark may be protectable at common-law—does not automatically warrant a like conclusion that Midwest Guaranty's mark is strong in the relevant geographic area. The Sixth Circuit has

recognized that "[e]ven an arbitrary trademark is not a strong mark, however, if it does not achieve broad public recognition across product lines." *Therma–Scan*, 295 F.3d at 631 (citing *Homeowners*, 931 F.2d at 1107).

Midwest Guaranty argues that it has achieved broad public recognition in the relevant geographic market. As support, Midwest Guaranty notes that it, exclusively has used the service mark "Midwest Guaranty Bank" in southeast Michigan since 1990, and that it has spent in excess of $2.5 million promoting its financial products and services (approximately $180,000 per year, on average). (Pl.'s Br. at 11–12; Maxson Declaration ¶'s 31–42.) Midwest Guaranty also states that its employees make "numerous" charitable appearances each year on behalf of the bank. (Maxson Declaration ¶'s 48–49.)

■ Advertising expenditures can potentially aid in creating public recognition. However, mere citation to an advertising budget does not, by itself, provide a basis for concluding that Midwest Guaranty's mark is strong in the relevant geographic area. Instead, it creates an attenuated link to actual market recognition. *Homeowners*, 931 F.2d at 1108 ("Outside of evidence of advertising budgets, which has an attenuated link to actual market recognition, Homeowners produced no evidence that consumers in the marketplace recognize HMS as a mark which brings Homeowners to mind.").

■ Other evidence, however, suggests that Midwest Guaranty's mark is strong in southeast Michigan. The geographic area involved in this case is relatively small, primarily encompassing south Oakland County, and a small portion of western

---

each word separately in order to show that the term in its entirety is descriptive is not the same thing as dissecting a mark.

2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:27 (4th ed.2002) (footnotes omitted).

Wayne County, Michigan. Thus, while mere citation to one's advertising budget does not normally provide strong evidence of a mark's strength, the fact that Midwest Guaranty has spent a considerable amount of money (nearly $200,000 per year), in a very concentrated area, does provide some circumstantial evidence in this case. More importantly, other evidence exists which buttresses this conclusion. Midwest Guaranty has been the exclusive user, with respect to banking and related financial services, of the Guaranty mark in Michigan since 1990.[7] Such continuous, exclusive use of a mark, in conjunction with a concentrated and significant advertising campaign, supports a conclusion that Midwest Guaranty's mark is strong in the local market. More importantly, substantial evidence of actual confusion, *see infra*, strongly supports such a conclusion.[8] 2 J. THOMAS McCARTHY, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:37 (4th ed. 2002) ("Evidence of actual confusion is strong evidence of secondary meaning.").

Guaranty disagrees, arguing that extensive third-party use of the term "Guaranty" weakens the strength of Midwest Guaranty's mark. But Guaranty produces no evidence of actual use of "Guaranty" in Michigan other than residence-based Guaranty Capital L.L.C.

■ The Court recognizes that according to the Sixth Circuit, "extensive third-party use[ ] of a trademark [ ] substantially weaken[s] the strength of a mark." *Homeowners*, 931 F.2d at 1108 (citation omitted); *Big Time Worldwide Concert & Sport Club at Town Ctr. v. Marriott Int'l*, 236 F.Supp.2d 791, 800 (E.D.Mich.2003). This rule must be applied, however, with caution: "merely showing the existence of marks in the records of the Patent and Trademark Office will not materially affect the distinctiveness of another's mark which is actively used in commerce. In order to be accorded weight a defendant must show what actually happens in the marketplace." *Id; see also Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 281 (6th Cir.1997) [hereinafter "*Daddy's Junky Music*"]. Evidence of numerous third-party registrations is only relevant if the registrations are "current and in current use ... in the very industry at issue." *Daddy's Junky Music*, 109 F.3d at 281; *see also Express Funding, Inc. v. Express Mortgage, Inc.*, 894 F.Supp. 1095, 1100–01 (E.D.Mich.1995) (recognizing that " '[t]he mere citation of third party *registrations* is not proof of third party *uses* for the purpose of showing a crowded field and relative weakness.' ") (emphasis in original). As explained by the Tenth Circuit, with respect to the widespread use of the term "First" by banks:

> These registrations and applications provide compelling evidence of what most consumers would recognize from experi-

---

7. Guaranty cites to Guaranty Capital, L.L.C., a Michigan entity formed on August 16, 1999. (Delbert Ruth Dep. at 6.) However, Guaranty Capital does not provide banking and/or related financial services, checking or savings accounts, offer debit cards or money market accounts, does not utilize automatic teller machines, and does not originate or service mortgage loans. (*Id.* at 9.) Instead, Guaranty Capital was founded to provide investment banking services to small and medium size companies. (*Id.* at 6.) It operates out of a residence which contains no signage. (*Id.* at 10.)

8. According to a District Court in the Eastern District of Michigan, there are generally five types of evidence which are considered when ascertaining whether secondary meaning has been attached to a mark: (1) survey evidence; (2) the length and manner of use of the mark; (3) the nature and extent of advertising and promotion of the mark; (4) the volume of sales; and (5) instances of actual confusion. *Sprinklets Water Ctr. v. McKesson Corp.* 806 F.Supp. 656, 661 n. 14 (E.D.Mich.1992).

ence; namely, that banks are wont to refer to themselves as the "First." This extensive use suggests that FIRST BANK per se is a weak term, at least when applied to the provision of financial services.

*First Savings Bank*, 101 F.3d at 654 (footnote omitted).

Guaranty has presented evidence of widespread actual use and registration of the term GUARANTY by financial institutions in *other states*. For example, in 1989, when Midwest Guaranty began operating in Michigan, several hundred state and federal trademark applications utilized the word GUARANTY or a variation

thereof;[9] numerous registrations were for entities offering banking/financial related services (22 federal[10] and 20 state). (Rodack Declaration ¶'s 7–11; Def.'s Resp. Br. Exh. 3–4.) None of these, however, were in Michigan, except for Guaranty Federal Savings & Loan which ended its use of that name in 1990. Actual use of the word GUARANTY can be demonstrated by the fact that 25 banks were insured by the FDIC in 1989,[11] (Rodack Declaration ¶ 4; Def.'s Resp. Br. Exh. 3), and at least 45 banks utilized the term GUARANTY on November 26, 2002,[12] the date this litigation was instituted by Midwest Guaranty. (Def.'s Br. at 3 and Exh. 7.) Once again, none of the banks were in Michigan.

9. Several utilized the spelling GUARANTEE.

10. Guaranty claims that 30 federal registrations existed in January, 1989. (Seth Rodack Declaration ¶ 11.) However, 8 of the registrations/applications were either abandoned and/or cancelled prior to 1989. (Def.'s Resp. Br. Exh. 4.)

11. These banks include: GUARANTY BANK, GUARANTY BOND BANK, GUARANTY NATIONAL BANK, MEMO GUARANTY BANK, STATE GUARANTY BANK, COMMUNITY GUARANTY SAVINGS BANK, WOODSVILLE GUARANTY SAVINGS BANK, LUMBEE GUARANTY BANK, GUARANTY BANK & TRUST, GUARANTY FSB, MIDWEST GUARANTY BANK, FIRST GUARANTY BANK, GUARANTY SAVINGS & HOMESTEAD ASSOCIATION, CITIZENS GUARANTY BANK, GUARANTY STATE BANK & TRUST, FIRST GUARANTY BANK & TRUST and GUARANTY BANK OF CALIFORNIA.

12. These banks were identified through the Dun & Bradstreet/American Business Information Search database. The banks include: GUARANTY BANK (Wisconsin), GUARANTY BANK (Texas), GUARANTY BANK (Illinois), GUARANTY BANK (Virginia), GUARANTY BANK (Louisiana), GUARANTY BANK (Pennsylvania), GUARANTY BANK (Ohio), GUARANTY BANK (Mississippi), GUARANTY BANK (California), GUARANTY BANK & TRUST (Louisiana), DEPOSIT GUARANTY BANK (Louisiana), CITIZENS GUARANTY BANK (Kentucky), COMMERCIAL GUARANTY BANCSHARES (Kansas), FIRST GUARANTY BANCORP (California), FIRST GUARANTY BANK (Louisiana), FIRST GUARANTY BANK & TRUST CO. (Florida), FIRST GUARANTY BANK INC. (Kentucky), FIRST GUARANTY BANK INVESTMENT (Florida), GUARANTY BANK TRUST CO. (Texas), GUARANTY BANCORP (New Hampshire), GUARANTY BANCSHARES (Oklahoma), GUARANTY BANCSHARES CORP. (Kansas), GUARANTY BANCSHARES INC. (Texas), GUARANTY BANK & TRUST (Kansas), GUARANTY BANK & TRUST (Missouri), GUARANTY BANK & TRUST CO. (Oklahoma), GUARANTY BANK & TRUST CO. (Mississippi), GUARANTY BANK & TRUST CO. (West Virginia), GUARANTY BANK & TRUST CO. (Florida), GUARANTY BANK & TRUST CO. (Iowa), GUARANTY BANK & TRUST CO. (Louisiana), GUARANTY BANK & TRUST CO. (Texas), GUARANTY BANK & TRUST CO. (Colorado), GUARANTY BANK OF CALIFORNIA (California), GUARANTY BANK OF MAMOU (Louisiana), GUARANTY FEDERAL BANK FSB (Wisconsin), HOME GUARANTY BANK (Illinois), JEFFERSON GUARANTY BANK (Louisiana), LUMBEE GUARANTY BANK (North Carolina), LYNDON GUARANTY BANK (New York), MENO GUARANTY BANK (Oklahoma), MIDWEST GUARANTY BANK (Michigan), STATE GUARANTY BANK (Oklahoma), TEXAS GUARANTY BANK (Texas) and WEST COAST GUARANTY BANK (Florida). (Def.'s Resp. Br. at 3–4 and Exh. 7.)

The fundamental problem with Guaranty's argument is that the aforementioned evidence only suggests that actual third-party use has weakened the GUARANTY mark in states such as Louisiana, Texas, Florida, Oklahoma and California, where banks, as discussed by the Tenth Circuit in *First Savings Bank, supra,* are wont to refer to themselves by utilizing the term GUARANTY. Since 1990, the GUARANTY mark has only been utilized in Michigan by Midwest Guaranty; as such, third-party use of the mark in distinct geographic regions of the county has not weakened the mark in southeast Michigan. As noted by the Sixth Circuit: "A mark might be weak in the national market, but might still be strong in the senior user's geographical and product area and thus deserving of protection." *Ameritech, Inc. v. American Information Technologies Corp.,* 811 F.2d 960, 967 (6th Cir.1987). Accordingly, the first factor favors Midwest Guaranty. *See, e.g., Express Funding,* 894 F.Supp. at 1101.

## 2. Relatedness of Services Offered

The Court also concludes that the parties' services are related. Indeed, at oral argument, Defendant's conceded that both parties offer similar banking services. The Sixth Circuit has identified three categories regarding the relatedness of the services of the parties:

First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely.

*Therma–Scan,* 295 F.3d at 632–33 (quoting *Daddy's Junky Music,* 109 F.3d at 282). "[S]ervices are not necessarily related, however, simply because they 'coexist in the same broad industry.'" *Id.* (quoting

*Homeowners,* 931 F.2d at 1109). Instead, services are related if they are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company. *Daddy's Junky Music,* 109 F.3d at 283 (citation omitted).

Here, the services clearly fall into the first category—the parties are direct competitors. According to Clarke Maxson, Midwest Guaranty is a community bank offering services to both individual consumers and businesses, including "adjustable rate mortgages, home equity loans, 15/30 year fixed rate mortgages, construction loans, jumbo loans, personal checking and savings accounts, automobile loans, boat loans, and personal loans." (Maxson Declaration ¶'s 13–14.) Similarly, Gerald Levy, Guaranty's Executive Chairman, stated that Guaranty provides "retail banking and residential mortgage services primarily to customers (as distinguished from businesses) using the 'GUARANTY' name." (Levy Declaration ¶ 3.)

It makes no difference, as argued by Guaranty, that Midwest Guaranty services both individual and business consumers, while Guaranty only services individual consumers. Both parties provide banking and mortgage services to individual consumers, thus, to a large extent, their services are nearly identical. *See, e.g., Express Funding, Inc.,* 894 F.Supp. at 1101. It also makes no difference, as further argued by Guaranty, that Guaranty has positioned itself in grocery stores, instead of free standing banks. The parties perform nearly identical services. Banks and financial institutions are continuously seeking new and more convenient methods of servicing their customers, including automated teller machines, internet banking, debit cards, and supermarket branches. The fact that Guaranty has chosen to utilize in-store banking as a method of reaching its customers does not diminish the

relatedness of the services offered and the potential confusion that may result when consumers are confronted with identical services being offered at both free-standing banks and in-store convenience branches. This factor strongly supports a conclusion that confusion is likely to occur.

### 3. Similarity of the Marks

■■ Similarity of the marks is an important factor. In its motion, Midwest Guaranty notes that the only difference between the parties' marks is the geographic identifier "Midwest." Midwest Guaranty argues that because it has been the exclusive user of GUARANTY in southeast Michigan since 1990, "when the public is 'singly presented' with the name GUARANTY BANK, Midwest Guaranty Bank will naturally come to mind." (Pl.'s Br. at 13.)

■■ Similarity of the marks "is a factor of considerable weight." *Daddy's Junky Music,* 109 F.3d at 283 (citing *Champions Golf Club,* 78 F.3d at 1119). The analysis involves more than a side-by-side comparison of the service marks. *Therma–Scan,* 295 F.3d at 633 (citing *Homeowners,* 931 F.2d at 1109.) The relevant inquiry is whether a particular trademark, when viewed alone, would lead to uncertainty about the goods or services that it identifies, accounting for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark. *Id.* (discussing *Daddy's Junky Music,* 109 F.3d at 283). The Court must view the marks in their entirely and focus on their overall impressions, not their individual features. *Daddy's Junky Music,* 109 F.3d at 283 (citations omitted). A proper analysis involves examining the pronunciation,

appearance, and verbal translation of the conflicting marks. *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1188 (6th Cir.1988).

It cannot be denied that the two marks bear considerable resemblance to each other—the only difference being the weak geographic identifier "Midwest." Furthermore, the only distinctive component of the two marks—the word "Guaranty"—is common to both. Actual consumers in southeast Michigan would, therefore, likely focus upon the term "Guaranty," potentially causing confusion in the marketplace when "Midwest Guaranty Bank" and "Guaranty Bank" are viewed in isolation; current and potential consumers may mistakenly believe that the parties are the same entity upon seeing the term GUARANTY, the dominant feature of both parties' marks. *See, e.g., Express Funding, Inc.,* 894 F.Supp. at 1102 (noting that "EXPRESS" was the dominant feature of both parties' marks, leading to a conclusion that the marks were similar, particularly given the generic nature of the remainder of the marks). This conclusion is buttressed by the fact that the Sixth Circuit has instructed that confusion should be judged from the perspective of those who may have a general, vague, or even hazy impression or recollection of the other party's mark.

The resemblance and pronunciation similarities are tempered somewhat by the actual appearance of the two parties' logos in the market. Attached to Mr. Maxson's declaration are numerous uses of Midwest Guaranty's logo. (Pl.'s Br. Exh. 1.) Midwest Guaranty's logo generally contains the word Midwest stacked upon the words Guaranty and Bank. The words are printed in a stylized font and are sandwiched between two bold lines. The phrase "Midwest Guaranty" is generally separated from the word "Bank," in print material,[13] by a distinctive and prominent picture of a

---

**13.** Midwest Guaranty's checks and deposit slips, employee business cards, stationary, and debit and credit cards usually contain the

bald eagle in flight. Midwest Guaranty's building signage, however, utilizes the block words Midwest Guaranty Bank, similar to Guaranty Bank's block signage (only one of Midwest Guaranty's signs has an eagle). Guaranty's logo, on the other hand, consists of nothing more than "Guaranty Bank" printed in nondescript bold, block letters. (Def.'s Resp. Br. at 19.) Thus, the overall outside signage appearance of these logos is quite similar. On the other hand, the print logos are distinguished by the eagle. The latter distinction in print logos may work to diminish the similarity of the marks when viewed by the consuming public. *See, e.g., First Savings Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 653 (10th Cir.1996).

Notwithstanding this difference in print materials, the Court concludes that the parties' marks, when viewed alone in the market, are confusingly similar. The Court reiterates the significant potential for confusion arising from the identifying signs utilized by Midwest Guaranty in front of its free-standing bank locations, (Pl.'s Exh. 56), which are similar to the identifying signage used by Guaranty Bank—the signs simply contain the mark "Midwest Guaranty Bank" without any use of an eagle (except for the Bingham Farms location). Thus, the signs publicly identifying Midwest Guaranty's actual bank branches, like that of Guaranty's branches, contain the parties' service mark in large block letters. Such similarity clearly is likely to cause confusion among the average consuming public. It makes no difference that Guaranty's signage utilizes banners, while Midwest Guaranty's signage utilizes marble/granite signage. The average consumer would not expect the same type of signage material to be utilized outside a free-standing bank branch and inside an in-store convenience branch,

physically constrained by the narrow confines of an established supermarket. Thus, because, as noted *supra,* the Sixth Circuit has instructed that confusion should be judged from the perspective of those who may have a general, vague, or even hazy impression or recollection of the other party's mark, the Court concludes that this factor weighs in favor of Midwest Guaranty.

### 4. Evidence of Actual Confusion

The Sixth Circuit has long recognized that evidence of actual confusion is "undoubtedly the best evidence of likelihood of confusion." *Therma–Scan,* 295 F.3d at 634 (quoting *Daddy's Junky Music,* 109 F.3d at 284). The weight to be given to such evidence depends, however, upon the type and amount of confusion that occurs. *Id.* (citing *Homeowners,* 931 F.2d at 1110.) In fact, the Sixth Circuit has recognized that the existence of only a few instances of actual confusion, after a significant period of time or after a significant level of concurrent sales, may actually lead to an inference that no likelihood of confusion exists. *Id.* (citing *Homeowners, supra*). "Similarly, confusion that is brief or that occurs among individuals who are not familiar with the [services] in question is entitled to considerably less weight than are 'chronic mistakes and serious confusion of actual consumers.'" *Id.* (quoting *Homeowners, supra*).

When evaluating this factor, the Court must also recognize that because "a successful Lanham Act plaintiff only must show a sufficient *potential* of confusion, not actual confusion, the fact that some confusion already has occurred favors plaintiff at least to some extent." *Daddy's Junky Music,* 109 F.3d at 284 (emphasis in original). On the other hand, a lack of such evidence is rarely significant because

eagle. The Court recognizes that, as demonstrated by Midwest Guaranty at the evidentia-

ry hearing, some of the promotional material did not contain the eagle.

of the difficulty of securing such evidence. *Id.* Thus, this factor is only weighted heavily when (1) evidence of actual confusion exists; or (2) when the particular circumstances indicate that such evidence should have been available. *Id.* (quoting *Wynn Oil*, 839 F.2d at 1188).

### (i) Hearsay/Other Objections

■ As a threshold matter, Guaranty has filed two hearsay objections to the numerous declarations submitted by Midwest Guaranty. Guaranty's objections with respect to these declarations are OVERRULED. The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted.*" FED. R. EVID. 801(c) (emphasis added).

■ The declarations made by Midwest Guaranty's employees do not contain hearsay statements because the statements attributable to third parties are not being offered to prove the truth of the matter asserted; instead, the are simply being offered to demonstrate that the statements were actually made—the statements are not hearsay because they are merely probative of the declarant's confusion. *See Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 & n. 10 (5th Cir.1982); *see also Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003–04 (2d Cir.1997); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1090–91 (7th Cir.1988); *Quantum Fitness Corp. v. Quantum Lifestyle Centers, L.L.C.*, 83 F.Supp.2d 810, 830 (S.D.Tex.1999); *Troublé v. Wet Seal, Inc.*, 179 F.Supp.2d 291, 298–99 (S.D.N.Y.2001). Furthermore, even if the statements are deemed to be hearsay under FRE 801(c), the statements may be admitted to show the declarant's then-existing state of mind.[14] FED. R. EVID. 803(3)[15]; *Armco*, 693 F.2d at 1160 n. 10; *Fun–Damental Too*, 111 F.3d at 1004; *Troublé*, 179 F.Supp.2d at 298–99; *Quantum Fitness Corp.*, 83 F.Supp.2d at 830; *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 9 F.Supp.2d 1347, 1360–61 (S.D.Fla.1998); *Heartsprings, Inc. v. Heartspring, Inc.*, 949 F.Supp. 1539, 1545 (D.Kan.1996).

■ Guaranty also claims that the declarations contained in Midwest Guaranty's Reply Brief and Supplemental Filings are improper because they do not rebut arguments and evidence raised in Guaranty's Response Brief, and Midwest Guaranty has not obtained leave of the Court to supplement the record. Guaranty describes this as an attempt to "sneak" the declarations into the record. The Court disagrees.

Before the Court is Midwest Guaranty's motion for preliminary injunction. Such a motion is heard on an expedited basis, with a record that is continuously developing. The need to continuously supplement the

---

14. Although the Sixth Circuit has not addressed this issue, it has recognized that only one circuit—the Eighth Circuit—has disagreed with this conclusion. *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 935 n. 1 (6th Cir.1999), *rev'd on other grounds*, 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001).

15. Federal Rule Evidence 803(3) provides that the following is not excluded by the hearsay rule:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

record is obvious—Guaranty has only recently entered the market and Midwest Guaranty's original motion for preliminary injunction was filed early in the litigation, in order to prevent Guaranty's further immersion into the market. As additional instances of confusion are reported, it is only natural, at this early juncture, to expect supplemental declarations. Such declarations will be accepted by the Court pursuant to Eastern District of Michigan Local Rule 7.1(f).

#### (ii) Midwest Guaranty's Evidence of Actual Confusion

Midwest Guaranty has presented 65 declarations representing 51 separate instances of purported "actual confusion" since November 2002.[16]

Midwest Guaranty has submitted numerous declarations from third parties, summarized below, who are casually acquainted with Midwest Guaranty. While these declarations are accorded less weight than individuals intimately involved, they do, nevertheless, provide evidence of actual confusion. *Homeowners*, 931 F.2d at 1110 (" 'Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight . . .' ") (quoting *Safeway Stores v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir.1982)).

| Dec. | Date | Individual | Brief Summary |
|------|------|-----------|---------------|
| # 3 | 12/3/02 | Federal Express Employee | Inquired if Guaranty had a branch in Westland, Michigan |
| # 6 | 11/18/02 | Job Applicant | Asked to speak to someone about Guaranty Bank job opportunities |
| # 7 | 11/22/02 | Karen | Inquired if the parties were related |
| # 10 | 12/3/02 | Job Applicant | Transmitted application material for Guaranty Bank |
| # 11, 18 | 1/23/03 | Job Applicant | Telephone directory assistance gave number to Midwest Guaranty instead of Guaranty |
| # 12 | 11/22/02 | Wisconsin Mortgage Co. Employee | Received Midwest Guaranty's telephone number by calling directory assistance and asking for Guaranty |
| # 13 | 1/10/03 | Unidentified Third Party | Inquired about escrow account of a Guaranty account holder |
| # 14 | 11/22/02 | Unidentified Third Party | Misdirected phone call |
| # 16, 17 | 11/24/02 | John Jack Swek | Spouse of Midwest Guaranty employee inquired if Midwest Guaranty was opening a branch in a Kroger supermarket |
| # 25 | 1/28/03 | Marilyn Quillan Nolan | Third-party at supermarket commented that she was initially confused by the two banks |
| # 26, 27 | 1/29/03 | United States Post Office Employee | Called wrong number attempting to verify a check drawn on a Guaranty Bank account |
| # 29, 34 | 1/9/03 | Job Applicant | Applied to Guaranty Bank |
| # 33 | 2/11/03 | "Charise" | Directory assistance gave wrong telephone number |
| # 35, 36 | 2/18/03 | Bobbie Gelman | Thought parties were affiliated |

16. Several declarations discuss the same incident.

| # 38 | 2/19/03 | Tracy Lorio | Magazine author attempted to call Guaranty President; retrieved phone number from Internet search engine |
|---|---|---|---|
| # 41 | 3/6/03 | "Check & Go" employee Asha | Attempted to verify a Guaranty check |
| # 43 | 3/12/03 | Unidentified Female | Asked if she reached Guaranty Bank |
| # 44, 47 | 2/22/03 | Marion Smigielski | Mother of Midwest Guaranty employee claimed that she was under the impression that Midwest Guaranty opened a branch in a Farmer Jack supermarket |
| # 45, 49 | 3/13/03 | James Edwin Wallace | Attempted to transact business at Midwest Guaranty having been given the location from directory assistance |
| # 46 | 3/11/03 | Unidentified Female | Called Midwest Guaranty in order to reach Guaranty employee |
| # 52 | 3/26/03 | Management Recruiting Company | Attempted to telephone Guaranty; retrieved telephone number from yellow pages |
| # 53 | 4/1/03 | Kristen @ Vacation Showroom | Verify Guaranty account; wrong telephone number |
| # 54 | 2/12/03 | Unidentified Female | Telephoned Midwest Guaranty because she knew the bank she was looking for was "Guaranty something or other" |
| # 58 | 4/3/2003 | Arlen—Standard Federal Bank | Verify funds; looked up Guaranty's phone number on the Internet and called the first number that appeared |
| # 59 | 4/1/03 | Erin Carneal | Asked Midwest Guaranty employee if Midwest Guaranty was the new bank moving into supermarkets |
| # 60 | 4/1/03 | | Mis-delivered mail |
| # 61 | 2/22/03 | Telecheck Employee | Verify funds |
| # 63 | 4/16/03 | Marissa Brown | Attempted to cash Guaranty check at a Midwest Guaranty branch |
| # 103 | 5/16/03 | Jena—Standard Federal Bank | Verify funds (found phone number in yellow pages) |
| # 104 | 5/14/03 | Andrea Norman—Charter One Bank | Verify account number/stop-payment orders for Guaranty account |
| # 105 | 3/21/03 | Celine Kleinhans | Sought employment with Guaranty, having received wrong bank name from contact person at Manpower Inc. |

These examples include a Federal Express employee, numerous job applicants, misdirected phone calls resulting from the use of directory assistance or internet search engines, as well as isolated check verification attempts made by employees of businesses such as the United States Post Office, "Check & Go," and "Vacation Showroom." Some of these purported instances of confusion amount to mere inattentiveness and carelessness, which are of very little significance. *Therma–Scan*, 295 F.3d at 636 (quoting *S.C. Johnson & Son, Inc. v. Johnson*, 266 F.2d 129, 141 (6th Cir.1959)) (" 'The owner of a trademark is not entitled to a guarantee against confusion in the minds of careless and indifferent buyers, and merely occasional cases of

confusion or thoughtless error by very inattentive purchasers are of very little significance in trademark and unfair competition cases.' "); *Commercial Savings Bank v. Hawkeye Federal Savings Bank*, 592 N.W.2d 321, 331 (Iowa 1999) ("First, the majority of mistakes concerning mail and delivery of documents were made by other entities doing business with Commercial Savings, not by actual customers. For the most part, it seems that these mistakes can be attributed to inattentiveness on the part of the caller or sender rather than actual confusion.").

Midwest Guaranty has, however, presented substantial evidence of actual confusion among the parties' customers and/or persons intimately acquainted with Midwest Guaranty and/or Guaranty. Specifically, Midwest Guaranty documented the following:

| Dec. | Date | Individual | Brief Summary |
| --- | --- | --- | --- |
| # 4, 15 | 1/9/03 | Customer David Raben | Customer commented that he was pleased that Midwest Guaranty opened a new branch at the Livonia Kroger supermarket |
| # 5 | 12/15/02 | Customer Nancy Booth Bissett | Midwest Guaranty employee's mother mentioned that Midwest Guaranty now had an ATM at a Kroger supermarket |
| # 8 | 12/18/02 | Customer Lori Morrison | Asked if she could bank at a Kroger in-store branch because it was closer to her home |
| # 9 | 1/16/03 | Guaranty Customer Michele Honaker | Guaranty customer attempted to withdraw funds and deposit check at Midwest Guaranty branch |
| # 28, 32 | 1/29/03 | Business Customer Caroline Fine | Called and inquired about Farmer Jack in-store location because she thought it was affiliated with Midwest Guaranty |
| # 30 | 2/7/03 | Customer Sherwin Cornelius | Commented that he noticed that Midwest Guaranty was opening a branch in a Kroger supermarket, noting that it was a more convenient location |
| # 31 | 2/10/03 | Customer Francis Papke | Stated that he thought he could do his banking at a Kroger in-store location |
| # 37, 40 | 2/21/03 | Customer/Employee Margaret Henderson | Asked if Midwest Guaranty was same as the Guaranty Bank in a supermarket, because she associated it with Midwest Guaranty |
| # 39, 48 | 2/19/03 | Customer Wendell Combs | Asked if Kroger in-store branch was a branch of Midwest Guaranty |
| # 42 | 3/14/03 | Unidentified Wife of Midwest Guaranty Customer | Inquired if Midwest Guaranty had a branch inside a Dearborn Farmer Jack, hoping that they were the same bank |
| # 50, 51 | 3/21/03 | Customer Lois Elain Latterell | Asked if Guaranty Bank in Farmer Jack was a Midwest Guaranty branch because her son told her about a Guaranty bank in the store |
| # 55 | 3/13/03 | Potential Customer Bruce Sewell | Inquired about new Guaranty Bank and the personal deposit accounts |

| # 62 | 4/17/03 | Customer Linda Wallace | Thought she could bank at a Farmer Jack in-store location |
|---|---|---|---|
| # 64, 65 | 4/15/03 | Business Customer Thomas Alcini | Customer's employee attempted to make deposits at a Farmer Jack location |
| # 80 | 4/3/03 | Supplier Julie Anne Kennedy | Asked Guaranty employee if he was a Midwest Guaranty employee after viewing his Guaranty Bank name tag |
| # 81 | 4/15/03 | Business Customer Thomas Alcini | Believed that he could make deposits at Farmer Jack in-store branch |
| # 86, 87 | N/A | Potential Business Customer James Veit | Telephoned to switch business account to Midwest Guaranty, believing he could bank at in-store location |
| # 90 | 5/7/03 | Unidentified Female | Requested telephone number of in-store branch |
| # 91 | 5/10/03 | Customer Celia Ransom | Attempted to cash Midwest Guaranty check at Farmer Jack location, believing that it was a Midwest Guaranty branch |
| # 102 | 4/10/03 | Guaranty Customer | Guaranty mortgage customer entered Midwest Guaranty branch for closing of her mortgage loan |

Serious confusion among actual consumers is accorded greater weight. *Homeowners*, 931 F.2d at 1110. Midwest Guaranty has presented multiple instances in which customers of Guaranty/Midwest Guaranty attempted to transact business at the wrong bank, providing convincing evidence of actual confusion. Other relevant declarations reveal Midwest Guaranty customers who believed that they could bank at Guaranty Bank's in-store branches because the parties were affiliated in some manner and/or general confusion regarding the affiliation of the in-store banking branches. Although there is no indication that any of these customers successfully transacted business at the wrong bank, the declarations reveal general confusion, which would clearly be destructive to Midwest Guaranty's reputation and overall business plan, a plan which has been predicated upon providing quality personal banking service to customers in southeast Michigan.

Given the fact that Guaranty entered the market in November, 2002, a mere six months ago, and the fact that Guaranty has only opened one-half of its anticipated in-store branches, these documented instances of confusion cannot be deemed isolated. *Cf. Therma–Scan*, 295 F.3d at 635–36. Furthermore, the fact that these declarations are the only "reported" instances of actual confusion does not mean that these are, in fact, the only instances of actual confusion which actually occurred during this time period; evidence of actual confusion is difficult to obtain. *See Daddy's Junky Music*, 109 F.3d at 284 (observing that a lack of evidence of actual confusion is rarely significant because of the difficulty of securing such evidence). Documentation of these nearly twenty instances in this relatively short time frame strongly supports a conclusion that confusion is likely to occur.

### 5. Marketing Channels Utilized

 This factor "consists of considerations of how and to whom the respective goods or services of the parties are sold." *Homeowners*, 931 F.2d at 1110. This requires an analysis of the parties' predomi-

nant customers and their marketing approaches. *Therma–Scan*, 295 F.3d at 636.

As previously noted, the parties service, to a large extent, an identical customer base. Furthermore, during the evidentiary hearing, the Court learned that both parties utilize similar marketing approaches—Midwest Guaranty utilizes television, radio, community newspapers, direct mail and point of sale advertising; Guaranty utilizes on-site signage, community newspapers, direct mail and point of sale advertising. This factor favors Midwest Guaranty. *Therma–Scan*, 295 F.3d at 636–37 ("This factor becomes particularly important where the other factors are not helpful, because it 'is very significant in illuminating what actually happens in the marketplace.'") (quoting *Homeowners*, 931 F.2d at 1110).

### 6. Degree of Customer Care and Sophistication

According to the Sixth Circuit:

Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Homeowners*, 931 F.2d at 1111 (citation omitted). Several courts have recognized that "consumers tend to exercise a relatively high degree of care in selecting banking services. As a result, customers are more likely to notice what, in other contexts, may be relatively minor differences in names." *First National Bank, in Sioux Falls*, 153 F.3d at 889; *see also*

*Empire National Bank of Traverse City v. Empire of America FSA*, 559 F.Supp. 650, 656 (W.D.Mich.1983); *Commercial Savings Bank*, 592 N.W.2d at 332. On the other hand, these decisions were rendered before the advent of supermarket banking and Internet banking, which undermines the earlier-in-time belief that bank customers exercise greater caution in selecting a bank, then say, in selecting a supermarket.

Further, "confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party." *Daddy's Junky Music*, 109 F.3d at 286 (citing *Champions Golf Club*, 78 F.3d at 1120–21). Given the similarity of the marks, the Court concludes that this factor does favor Midwest Guaranty.

### 7. Guaranty's Intent in Selecting the Mark

According to the Sixth Circuit:

If a party chooses a mark with the intention of creating confusion between its products and those of another company, "that fact alone may be sufficient to justify an inference of confusing similarity." [*Daddy's Junky Music*, 109 F.3d] at 286 (citation omitted). Circumstantial evidence of copying, particularly "the use of a contested mark with knowledge of the protected mark at issue," is sufficient to support an inference of intentional infringement where direct evidence is not available. *Id.; see Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Cir.1996) (instructing the district court to evaluate the credibility of one of the defendant's former employees, who testified that he had told the defendant's owner about the prior use of the mark by the plaintiff). Where there

is no evidence that the defendant actually knew that a protected trademark existed, such knowledge can be presumed if evidence exists of the plaintiff's "extensive advertising and long-term use of a protected mark." *Daddy's Junky Music Stores,* 109 F.3d at 286. *Therma–Scan,* 295 F.3d at 638–39.

During the evidentiary hearing, counsel for Midwest Guaranty conceded that Guaranty did not choose the mark "Guaranty Bank" with the intention of creating confusion. On the other hand, when Guaranty came into this market it was aware of Midwest Guaranty's presence in the market, and Guaranty chose not to enter the market with a new name, thereby intentionally carrying its mark into the territory of Midwest Guaranty Bank.

### 8. Likelihood of Expansion of Product Lines

Both parties acknowledge that this factor is not relevant in this case.

### 9. A Strong Likelihood of Success on the Merits Has Been Established

When synthesizing the eight factors, it becomes clear that virtually all of the important factors favor Midwest Guaranty. Circumstantial evidence supports a finding that Midwest Guaranty's mark is strong in the relevant geographic area. Moreover, the parties services are related and their marks are confusingly similar. Finally, and most importantly, evidence of actual confusion strongly supports a conclusion that confusion is likely to occur. Based on the record currently before the Court, Midwest Guaranty has succeeded in establishing a strong likelihood of success.

### D. Irreparable Injury

■ Midwest Guaranty claims that it will suffer irreparable injury if a preliminary injunction does not issue in this case. As noted by Midwest Guaranty, this inquiry is inextricably intertwined with the likelihood that Midwest Guaranty will succeed on the merits.

The law of this Circuit holds that no particular finding of likelihood of entry or irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases. *See Wynn Oil Co. v. American Way Serv. Corp.,* 943 F.2d 595, 608 (6th Cir.1991). The *Wynn* Court noted that irreparable injury "ordinarily follows when a likelihood of confusion or possible risk to reputation appears" from infringement or unfair competition. *Id.* (quoting *Koppers Co. v. Krupp–Koppers GmbH,* 517 F.Supp. 836, 849 (W.D.Pa.1981)). Thus, a court need only find that a defendant is liable for infringement or unfair competition for it to award injunctive relief. *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1056 (6th Cir.1999). "The irreparable injury flows 'both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values ...'" such as Midwest Guaranty's reputation and goodwill in southeast Michigan. *See Wynn Oil Co. v. American Way Service Corp.,* 943 F.2d 595, 608 (6th Cir.1991) (citation omitted). Consequently, given the likelihood of confusion between the parties' marks and the difficulty in calculating damages, the harm caused by failing to issue an injunction would be irreparable.

### E. Harm to Others

■ Guaranty argues that a preliminary injunction would cause substantial harm to itself and others. Guaranty estimated that it would cost $10,908,402 *over ten years* if it were required to use a different name in Michigan. (Jay Skemp Declaration.) Guaranty believes that it would be required to hire an additional 17.5 employees, in addition to other ongoing costs of operation. Additionally, Guar-

anty claims that it would be forced to incur substantial up-front costs, including changing branch and ATM signage, developing and maintaining a separate website, changing bank forms and brochures, and setting up a separate voice activated response system. (Skemp Dec. ¶ 7.) Finally, Guaranty contends that it would be impractical to revert back to "Guaranty Bank" if an injunction were entered by the Court and then overturned on appeal. (Skemp Dec. ¶ 8.)

Even, assuming *arguendo,* that Guaranty's claim of costs over ten years is accurate, the Court, nonetheless, rejects Guaranty's argument as to harm. Gerald Levy, Guaranty's Executive Chairman, acknowledges that in August 2002, several months before Guaranty opened its first Michigan in-store branch, he was aware that Midwest Guaranty was operating in the relevant geographic area. Additionally, only days after Guaranty opened its first in-store branch, counsel for Midwest Guaranty sent a cease and desist letter to Guaranty. (Pl.'s Exh. 84.) Finally, and most important, Guaranty was well aware of the risks associated with entering a market in which a direct competitor was already utilizing a confusingly similar mark because Guaranty has a history of aggressively attacking the use of the word "Guaranty" by others in its market—Guaranty had previously enforced its common-law rights against Guaranty Federal Savings Bank, a California Bank, and Guaranty Mortgage. (Pl.'s Exhs. 82, 88, 89.) In fact, Guaranty rejected Guaranty Mortgage's offer to operate under the name "Guaranty Mortgage Bancorp Services," noting that "the last two words constitute an insufficient distinction even if they were immediately ad-

jacent to the first two words." (Pl.'s Exh. 89.)

The Court agrees with Midwest Guaranty that any alleged actual harm suffered by Guaranty has been self-inflicted. During the evidentiary hearing, Gerald Levy acknowledged that the costs of operating under two names would be substantially the same, whether they occurred before Guaranty entered the Michigan market, or after a preliminary injunction has been entered by the Court at this juncture. Thus, Guaranty placed itself in a position of risk. It chose to enter southeast Michigan under the mistaken belief that the marks were not confusingly similar despite its localized claims of "Guaranty" confusion in Wisconsin. Guaranty, having made this strategic decision, cannot now claim that a preliminary injunction should not issue because it would be forced to incur the same costs that it would have incurred had it properly entered the Michigan market. Stated another way, Guaranty cannot place itself in harms way, and then later claim that an injunction should not issue because of costs which it must incur in order to remedy its own misconduct.[17]

## F. Public Interest

The public interest is served by protecting one's trademark rights and avoiding confusion in the marketplace. *R.L. Polk & Co. v. INFOUSA, Inc.,* 230 F.Supp.2d 780, 796–97 (E.D.Mich.2002) (citations omitted).

The policy behind protecting trademarks is to prevent the public from being misled as to the source or origin of the goods or services they are buying. "Trademark infringement, by its very

---

17. Similarly, the potential harm to Michigan employees and the disruption to Farmer Jack and Kroger do not override the irreparable harm caused by Guaranty in this market. A quick name changeover by Guaranty in the 30 day grace period provided by this Court should eliminate any significant harm to its Michigan employees and to the Farmer Jack and Kroger supermarket locations.

nature, adversely affects the public interest in the 'free flow' of truthful commercial information." Thus, enjoining Defendant from using a mark confusingly similar to [Plaintiff's] mark would best serve the public interest.

*Big Boy Restaurants v. Cadillac Coffee Co.,* 238 F.Supp.2d 866, 873 (E.D.Mich. 2002) (internal citation omitted). As such, an injunction will serve the public interest.

### G. A Preliminary Injunction is Granted

After weighing the four preliminary injunction factors, the Court concludes that Midwest Guaranty's motion for preliminary injunction must be granted. Plaintiff has demonstrated a strong likelihood of success on the merits. Additionally, the irreparable harm likely to be suffered by Midwest Guaranty is not outweighed by any alleged harm to others. Finally, an injunction will serve the public interest.

As such, pending a final trial on the merits, Guaranty is hereby RESTRAINED and ENJOINED from using the mark GUARANTY BANK in conjunction with its banking and related financial services offered in southeast Michigan.[18] Guaranty, however, shall have 30 days from the date a security bond is posted by Midwest Guaranty, *see infra,* to terminate operating bank branches in southeast Michigan under the Guaranty Bank name.

### H. Federal Rule of Civil Procedure 65(c)—Bond

█ Federal Rule of Civil Procedure 65(c) states, in relevant part:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as

may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

Fed.R.Civ.P. 65(c). While a district court must consider whether security is appropriate, the court need not actually require security—instead, the decision is left to the sound discretion of the court. *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 539 (6th Cir.1978); *see also Moltan Co. v. Eagle–Picher Indus., Inc.,* 55 F.3d 1171, 1176 (6th Cir.1995) ("While we recognize that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.").

Guaranty contends that a bond of no less than $10 million is required in this case. Midwest Guaranty, on the other hand, argues that no bond, or a de minimus bond in the amount of $5,000 or $10,000 should be entered in this case. Based on the record currently before the Court, including testimony given during the evidentiary hearing, the Court concludes that a $500,000 bond is appropriate in this case.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion for preliminary injunction. Specifically, pending a final trial on the merits, Defendant is hereby RESTRAINED and ENJOINED from using the mark GUARANTY BANK in conjunction with its banking and related financial services offered in southeast Michigan. Defendant, however, shall have 30 days from the date a security bond is

---

**18.** Testimony elicited during the evidentiary hearing indicates that any concern with respect to the Interagency Statement on Branch

Names can be properly managed and mitigated by Guaranty.

posted by Plaintiff to terminate banking operations in southeast Michigan under the name Guaranty Bank.

SO ORDERED.